STATE ex rel BOTKIN et al, Plaintiffs, v. WELSH, Director of Taxation, et al, Defendants.

(251 N. W. 189.)

(File No. 7606.   Opinion filed December 1, 1933.)

*M. Q. Sharpe,* of Kennebec, and *E. E. Wagner,* of Pierre, for Plaintiffs.

*R. F. Drewry* and *B. D. Mintener,* Assistant Attorneys General, for Defendants.

CAMPBELL, J. ██ This is an original proceeding instituted in this court upon an order to show cause procured by the relator in behalf of himself and all others similarly situated seeking to determine the constitutionality of chapter 184, Laws 1933, commonly spoken of as the Gross Income Tax Law. At the outset defendants, while conceding that this court has jurisdiction if it sees fit to exercise the same, urge nevertheless that this court should in its discretion refuse to entertain the matter and dismiss the proceeding. In just what cases and under just what circumstances a court, primarily appellate, ought, in its discretion, to exercise the original jurisdiction constitutionally conferred upon it has been frequently dealt with in the decisions. The broad general principles which should control the exercise of such discretion are not unduly difficult of statement though the application of such principles to every individual case is not always so free from doubt. In the instant proceeding the attorney general of this state is made a party defendant. The complaint does not specifically allege that he was requested to institute the proceeding, but it is freely admitted upon the oral argument that any such request addressed to him would have been entirely futile. The statute in question purports by its terms directly to affect every citizen of this state who receives

money from any source whatever and all non-residents who receive money from sources within the state. The act by its own terms announces that it is an emergency revenue measure and this court has held (State ex rel Botkin v. Morrison [1933] 61 S. D. 344, 249 N. W. 563) that it was not subject to the referendum. In anticipation of proceeds to be derived from the operation of the act the state tax commission has refrained from making at the time specified by law any general property levy whatsoever for state purposes. Exactions under the law are daily being imposed upon large numbers of citizens by withholdings from their gross receipts at the source thereof. The sovereign prerogative of the state and the financial support of the state government are involved, as are likewise the direct financial interests of practically every citizen. Indeed it is difficult to conceive of a case where the state and its citizens could be more vitally interested in having the general constitutionality or unconstitutionality of a statute determined by a court of last resort at the earliest possible moment. The case seems clearly one where we ought, conformably to principles heretofore enunciated by this court, and in accordance with the previous practice of this court, to entertain jurisdiction, and in fact we think we would be derelict in our duty should we refuse so to do. See Everitt v. Bd. County Comrs. Hughes County (1890) 1 S. D. 365, 47 N. W. 296; Stavig v. Van Camp (1923) 46 S. D. 302, 192 N. W. 760; White Eagle Oil & Ref. Co. v. Gunderson ('1925) 48 S. D. 608, 205 N. W. 614, 43 A. L. R. 397. Cf. also St. ex rel Bolens v. Frear (1912) 148 Wis. 456, 134 N. W. 673, 135 N. W. 164, L. R. A. 1915B, 569, 606, Ann. Cas. 1913A, 1147; State ex rel Atwood v. Johnson (1919) 170 Wis. 218, 175 N. W. 589, 7 A. L. R. 1617; St. ex rel Time Ins. Co. v. Smith (1924) 184 Wis. 455, 200 N. W. 65; People ex rel Kocourek v. City of Chicago (1901) 193 Ill. 507, 62 N. E. 179, 58 L. R. A. 833; Gramling v. Maxwell (D. C., 1931) 52 F. (2d) 256.

The portions of the act principally essential for consideration are the title and the first five sections thereof, which are as follows:

"An Act Entitled, An Act Imposing a Tax on Gross Incomes, Providing Generally for the Levy, Assessment, Collection and Distribution Thereof; for Regulatory Measures for the Enforcement of the Act, Providing for Exemptions, Imposing Penalties for Violations of the Provisions of the Act and Repealing Sections

7922 of the 1919 Revised Code of South Dakota, and Chapter 107 of the Session Laws of South Dakota of 1919.

"Be It Enacted by the Legislature of the State of South Dakota:

"Section 1. *Definitions.* Unless otherwise specifically provided, when used in this act:

"(a)   The term 'Person' means an individual or a natural person, a trust or estate, any co-partnership, firm, corporation, joint adventure, association, fiduciary or other entity however composed, and any corporation or combination acting as a unit, and the plural as well as the singular number.

"(b)   'Corporation' includes the term corporations organized and created under the laws of this state, any other state or foreign country, associations, joint stock companies, mutual companies and insurance companies.

"(c)   The term 'Domestic' when applied to a corporation, partnership or association, means created and organized in the State of South Dakota under the laws of the State of South Dakota and transacting some part of its business within this state.

"(d)   The term 'Foreign' when applied to a corporation, partnership or other association, means a corporation, partnership or other association which is not domestic.

"(e)   The term 'taxpayer' means any person, as defined by this Act, subject to a tax imposed by this Act.

"(f)   The term 'Tax Year' or 'Taxable Year' means either the calendar year or the taxpayer's fiscal year when permission is obtained from the Director of Taxation to use same as the tax period in lieu of the calendar year.

"(g)   The term 'Gross Income' means the aggregate sum in value, or its equivalent, passing in any transaction of business, as compensation for personal service, and from trade, business, commerce, sales and the value proceeding or accruing from the sale of tangible property, real or personal, or service, or both, and all receipts, actual or accrued, by reason of the investment of capital of the business engaged in, including interest, discounts, rentals, royalties, dividends, fees, wages, salaries, commissions or other emoluments, however designated, without any deduction on account of the cost of property sold, the cost of materials used, labor costs, interest or discount paid, or any other expense whatsoever; and

without any deduction on account of losses; provided, however, that when credit is extended for the whole, or any part of the consideration proceeding from any business transaction, such credit receivable shall not be deemed to constitute gross receipts or gross income until collected. Provided, further, that upon the sale of any property or commodity, delivered out of the state, the freight or transportation cost, actually paid thereon, shall not be deemed gross income. Provided further, that cash discounts, allowed and taken on sales, shall not be included as gross income; and further provided, that goods, wares or merchandise, or the value thereof, returned by customers when the sale price is refunded, either in cash or credit, shall not be deemed included in gross receipts or income. Interest accruing after this Act becomes effective and received upon any indebtedness, loan or deposit of money, security or investment, and discounts charged, when collected, shall constitute gross receipts. The payment of any obligation for borrowed money, whether such obligation be evidenced by note, bond, or other instrument, or not, and the withdrawal of deposits, shall not, as to the principal of such obligation, constitute gross receipts or income. Gasoline, cigarette and malt taxes, imposed by the laws of this state, shall remain in full force and effect, but the amount of such taxes paid by the taxpayer shall not be deemed gross income; the receipt of money or property by assignment for the benefit of creditors or as trustees upon the creation of a trust, or the pledge of property for security, shall not be deemed gross income. The receipts of capital by a corporation, co-partnership, firm or joint adventure, for sale of stock in such corporation, co-partnership, firm or joint adventure, or contributions to capital by the members of any other organizations, shall not be deemed gross income, but any sums received in excess of the amount of such capital shall be taxable as gross income. Proceeds accruing or proceeding from subsequent transactions in the stock of such corporations or organizations, or in the interests of shares of the members of any organization shall be taxable.

"(h) The term 'Wholesale' shall include any person doing a regularly organized wholesale business known to the trade as such, selling only to registered retail merchants or jobbers, and also, persons engaged in acquiring and assembling by purchase from others, articles and commodities of trade, commerce and production

within the state, for the purpose of resale and selling and marketing or shipping the same in bulk; but such terms shall be applied only to such activities as are wholesale in their character as such term is ordinarily used and understood.

"(i) The term 'Manufacturer' shall mean persons engaging, or continuing within the state in the business of manufacturing, compounding, processing, producing or preparing for sale, profit or use, either as a finished or partly finished product, any article, substance, product or commodity, the production of which the manufacturer is calculated for sale at wholesale, or for further processing and manufacture.

"(j) The term 'Includes' and 'Including,' when used in a definition contained herein, shall not be deemed to exclude other things otherwise within the meaning of the term defined.

"Section 2. That from and after the 1st day of July, 1933, there is hereby annually levied upon every person, individual, firm, co-partnership, joint adventure, association, corporation, trust, estate or other group or combination acting as a unit, located in or transacting business in the State of South Dakota, or receiving a gross income, as defined in this act, a tax with respect to his or its entire gross income, as defined herein, at the rates hereinafter specified, such tax being hereby levied for each taxable year at such specified rate upon and with respect to the entire gross income, as herein defined, for the purposes of taxation, except as herein provided, from all property owned, and from every business, trade, profession or occupation carried on in this state by persons not residents of this state. But, a non-resident individual receiving income from labor performed, business done, or property located in this state, and income from labor performed, business done, or property located outside of this state, shall be taxable only upon the amount of income received by such taxpayer from labor performed, business done, or property located within this state. The remainder of the income received by him shall be deemed nontaxable by this state. The taxes levied by this section shall be assessed, collected and paid at the following specified rates, to wit:

"(a) Upon every person, engaging or continuing within this state in the business of manufacturing, processing, compounding, or preparing for sale, profit or use, any article or articles, substance or substances, commodity or commodities, the amount of

such tax to be equal to the value of the articles manufactured, processed, compounded or prepared for sale, as shown by the gross proceeds derived from the sale thereof by the manufacturer, except as hereinafter provided, multiplied by a rate of one-fourth of one per cent. The measure of this tax is the value of the entire product manufactured, processed, compounded, or prepared for sale, profit or use in this state, regardless of the place of sale or the fact that deliveries may be made to points outside the state.

"(b)  Upon every person, engaging or continuing within this state in business as a wholesaler and doing a regularly organized wholesale business as commonly understood and known, selling only to licensed retail merchants or jobbers, upon such part of their business as may be strictly wholesale, and where the same comes directly into competition with similar interstate business, the amount of such tax shall be equal to the gross income from such wholesale business multiplied by a rate of one-fourth of one per cent. The measure of this tax is the value of the commodities or merchandise entering into sale, or profit or use in this state, regardless of the place of sale or the fact that deliveries may be made outside of the state.

"(c)  Upon every person engaging or continuing within this state in the business of producing, feeding, buying, selling or marketing live stock, and operating regularly in such production, buying, selling or marketing, either exclusively or as a part of a general business operation, upon such part of their business as shall be confined to the raising, producing, feeding, buying, selling or marketing of live stock, the amount of such tax shall be equal to the gross income from such live stock operations multiplied by a rate of one-half of one per cent. The measure of this tax is the value of such live stock entering into sale or profit or use in this state regardless of the place of sale or the fact that deliveries may be made outside of this state.

"(d)  Upon every person located in, or engaging or continuing in any occupation, trade, profession, or calling where the gross income is represented by a compensation in the form of wages or salaries the amount of the tax levied and imposed by this act shall be equal to the gross income of such person multiplied by a rate of one per cent (1%) on such income up to $2,000, and one and one-half per cent (1½%) on all such income in excess of $2,000

and up to $5,000, and two per cent (2%) on all income in excess of $5,000.

"(e) Upon every person, located in, or engaging or continuing in any business, trade, profession or occupation within this state other than those businesses included in the four preceding subdivisions of this section, the amount of the tax levied and imposed by this act shall be equal to the gross income of such person multiplied by a rate of one per cent, excepting that the distributed share of the income of a co-partnership, firm or joint adventure upon which the tax has been paid coming to the individual member of such organization shall be taxable only at a rate which shall be equal to the difference between the rate of tax paid by such co-partnership, firm or joint adventure and the rate of one per cent.

"If any person liable for any tax under subdivisions (a) and (b) and (c) of this section shall ship or transport his products or any part thereof out of the state without making sale of such products, the value of the products or articles in the condition or form in which they existed when transported out of the state shall be the basis for the determination of the amount that shall be reflected into the gross income and with other income be subject to the tax imposed by this act.

"The Director of Taxation shall prescribe equitable and uniform rules for the full interpretation of the requirements of this section and this act in ascertaining values, and determining the proper classification of taxpayers. Such rules shall prescribe the conditions under which prepaid transportation charges upon shipments of products for sale may be deducted from the sale value of such products.

"Section 3. There are, however, exempted from the provisions of this act: (a) Fire Insurance Companies, Life, Health, Casualty, and Accident Insurance Companies which, under the provisions of the law of this state, now pay to the State of South Dakota taxes upon the basis of gross premium income. (b) Mutual Insurance Companies which, under the provisions of Chapter 267 of the Session Laws of 1921, are exempted from taxation excepting by a gross premium tax imposed. (c) Farmers or other mutual Hail, Cyclone, Casualty, Fire or other Insurance Companies or Associations including Inter-insurers and Reciprocal Underwriters, the income of which is used or held for the purpose of

paying losses or expenses. (d) Express Companies which pay to the State of South Dakota a tax upon gross income under the provisions of Chapter 90 of the Session Laws of 1925, as amended by Chapter 47 of the Session Laws of 1927. (e) Those societies and organizations to which exemption from taxation is granted by the terms of Section 6670 of the 1919 Revised Code and acts amendatory thereof, the exemption from the application of this Act, however, to be subject to the same qualifiations and limitations as are applied by the provisions of the said section. The Director of Taxation is hereby empowered and directed to make proper rules and regulations governing the extension of the exemptions authorized by this section, so as to extend exemption from the provisions of this act in all cases where under existing law, a tax on the basis of gross earnings or receipts is imposed.

"Section 4. The term 'gross income' does not include the following items, which shall be exempt from taxation under this Chapter:

"(a) The proceeds of life insurance policies and contracts paid upon the death of the insured or policy loans and cash surrenders made.

"(b) The amount received by the insured as a return of premium or premiums paid by him under life insurance, endowment or annuity contracts, either during the term or at the maturity of term mentioned in the contract, or at the surrender of the contract.

"(c) The value of property acquired by gift, bequest, devise or inheritance received during the year, but the income received from such gifts, bequests, devises and inheritances shall be assessed under the provisions of this chapter.

"(d) Any amount received through accident or health insurance or under workmen's compensation act as compensation for personal injuries or sickness, and the amount of any damages received, whether by suit or agreement, on account of such injuries or sickness.

"(e) Interest upon obligations of the United States or of this state, and interest upon securities issued under the provisions of Federal law, where such interest is exempted from taxation by laws of the United States or of this state.

"(f)   Salaries, wages and other compensation received from the United States by officers or employees thereof, and pensions and compensations received from the United States, where the same is specifically exempted from taxation by law.

"Section 5.   The taxes levied hereunder shall be payable in quarterly installments on or before the expiration of thirty days from the end of the quarter in which the tax accrues.   The taxpayer shall, within thirty days from the expiration of each quarter, make out an estimate of the tax for which he is liable for such quarter, and mail the same together with a remittance in the form required by Section 7 of this act for the amount of the tax, to the office of the Director of Taxation.   Provided, however, that where the tax any taxpayer is liable for under this act shall exceed an average of ten dollars ($10.00) per month, such taxpayer shall be permitted to make monthly payments, and the Director of Taxation may, in his discretion, where the tax liability of the taxpayer is in excess of the monthly average of ten dollars ($10.00) require monthly estimates and payments."

At this point and preliminary to the detailed examination of the issues involved, we may conveniently exclude certain matters not material to a determination of the questions before us and set out some general postulates which must apply throughout to the consideration and solution of the problems presented.

■ The statute in terms provides (section 21) : "This act being an emergency revenue measure, shall expire and stand repealed on the 30th day of June, 1935."   In a comparatively recent case involving the constitutionality of a tax law (State ex rel Stiner v. Yelle [1933, Wash.] 25 P. (2d) 91, 95), the majority of the court in arriving at their decision appeared to attach some appreciable weight to a similar legislative declaration, saying: "This is an emergency measure limited by its terms to a two year period.   If it works injustice to some it will be but temporary, and such temporary injustice, if any, must be borne for the common good."   In another recent case (Blaisdell v. Home Bldg. and Loan Assn. [1933, Minn.] 249 N.W. 334, 86 A.L.R. 1507) an inference appears justifiable from the language used that economic emergency may render legislative action constitutional which, but for such emergency, would not be constitutional.   Manifestly, where the constitutional criterion of the validity of a legislative act is whether such act is

reasonable or arbitrary a fact question is involved and the social and economic situation becomes material. If the cases above mentioned mean to go further than this, however, and intend their language to give rise to an inference that legislative action which the constitution clearly and definitely forbids may nevertheless be valid, if there is or seems temporarily to be a sufficiently urgent social need for that type of legislation, then, and to that extent, they promulgate a doctrine with which we cannot agree. If the present law is a type of tax law within the constitutional power of the legislature to enact, all well and good. If it is beyond the power of the legislature to enact this kind of a tax law, then the law cannot derive validity from the fact that there is urgent need for revenue or from the fact that the legislature states that the law is to continue in effect for two years only.

"Such a doctrine would make the Legislature and the courts the judges of when an emergency is of sufficient magnitude to justify setting aside the provisions and inhibitions contained in the Bill of Rights. Such was never the intention of the founders of our Constitution. When they wrote into our Bill of Rights ('Const. art. 1, § 29), '* * * We declare that everything in this "Bill of Rights" is excepted out of the general powers of government, * * *' they mean exactly what they said. When they said such powers were taken out of the general powers of government, they meant they were taken out of the police power of the government.

"If the people are dissatisfied with what they have placed in their Bill of Rights, they have the power to change its provisions. If they are dissatisfied with the provisions of the United States Constitution, they can repeal them, as they are now attempting to do with the Eighteenth Amendment. But, so long as the people who are the sovereign power in the government permit these provisions to stand, it is the duty of the courts to see that such inhibitions are not violated and to declare all laws which directly conflict with such provisions of our organic law to be null and void." Murphy v. Phillips (1933, Tex. Civ. App.) 63 S. W. (2d) 404, 409.

We may also set off from consideration another matter. The line between an exercise of the police power and an exercise of the taxing power is frequently difficult to discern. The broad distinction is easy of statement, of course, to the general effect that the exercise of the police power is for purposes of reg-

ulation and the exercise of the taxing power is for the raising of revenue, but there is a marked tendency, both in practice and in the decisions, toward a merger of these powers, and it is not uncommon to find in a single statute a certain degree of police power regulation of a given business accompanied by an imposition on such business under the taxing power. It appears to be held by some courts, too, that the taxing power may be availed of to some extent and under some circumstances, not only for acquisition of revenue, but also in aid of certain broad social policies and for the purpose of encouraging businesses which the state wishes to promote and discouraging others. For some discussion of this principle and citation of authorities, see the dissenting opinion of Mr. Justice Brandeis in Liggett Co. v. Lee (1933) 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699. We need not be concerned with any of those situations in this case. Manifestly, we have here no effort to effect any broad social policy by the encouragement or discouragement of any particular occupation, industry, or vocation reached by the act. The act is very clearly, as all counsel in the case admit, an exercise of the taxing power of the state as distinct and separate from the police power, and an exercise of the taxing power for purposes of revenue only and not for business control.

■ This case, of course, falls under the general rule so axiomatic as doubtless to be unnecessary of statement that every presumption is in favor of the validity and propriety of legislative action and that no statute should be held unconstitutional by any court unless its infringement of constitutional restrictions is so plain and palpable as to admit of no reasonable doubt. State v. Hoven (1923) 47 S. D. 50, 195 N. W. 838; Opinion of the Judges (1925) 48 S. D. 375, 204 N. W. 905; Warren v. Brown (1930) 57 S. D. 528, 234 N. W. 38. As has been so well said by Mr. Justice Holmes:

"Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." Mo. etc., Ry. Co. v. May (1904) 194 U. S. 267, 24 S. Ct. 638, 639, 48 L. Ed. 971.

■ The application of this salutary doctrine to the consideration of legislation in the tax field is of peculiar importance. The taxing

power inheres in sovereignty and, as we have previously taken occasion to emphasize (Hughes County v. Henry [1925] 48 S. D. 98, 202 N. W. 286), the existence and exercise of that power are absolutely essential to the preservation of the state. The exercise of the taxing power is vested, under our governmental structure, in the legislative department and its conduct in that field should be sustained and supported by the courts to the utmost possible limits and restricted or denied most cautiously and only in the clearest cases. No state can exist without the provision of adequate revenues, and the need for revenue and the practical possibility of securing it from various and sundry sources are conditioned by the social and economic situation of the state and not by constitutional theory. The courts should, and they do, go a great way to sustain the validity of legislative action intended to raise revenue.

"The power to impose taxes is one so unlimited in force and so searching in extent, that the courts scarcely venture to declare that it is subject to any restrictions whatever, except such as rest in the discretion of the authority which exercises it. It reaches to every trade or occupation; to every object of industry, use, or enjoyment; to every species of possession; and it imposes a burden which, in case of failure to discharge it, may be followed by seizure and sale or confiscation of property. No attribute of sovereignty is more pervading, and at no point does the power of the government affect more constantly and intimately all the relations of life than through the exactions made under it." Cooley's Constitutional Limitations, 8th Ed., vol. 2, p. 986.

As a matter of actual fact and practice, a revenue measure is usually constructed with infinitely more attention to the exigency of the occasion than to constitutional law. The public need for revenue seems always, especially of late years, to exceed the readily available supply. Some economist or tax theorist or interested group conceives a scheme or plan of taxation, whether broad or limited in scope, which it is believed or hoped will be productive, practically workable, reasonably equitable, and of a type which the citizens generally will tolerate. The proponents do not ordinarily disturb themselves much about any questions of constitutionality. The scheme is enacted into law by the legislature (perhaps after more or less contest and opposition) and then the courts are called

upon to furnish a foundation for the edifice by inserting under it, if possible, an adequate base of constitutional validity. The reading of any considerable number of tax law decisions reveals the fact that the successes exceed the failures in this field of judicial enterprise by a margin that is little short of astonishing. So long as the state taxing scheme refrains from undue interference with interstate and foreign commerce and Federal instrumentalities the Federal courts display a very manifest and entirely proper reluctance to disturb it. Perhaps the two outstanding examples in recent years of cases wherein the Supreme Court of the United States has declared a state taxing statute invalid on any ground other than such interference are the mortgage registry tax case, Louisville Gas and Electric Co. v. Coleman (1928) 277 U. S. 32, 48. S. Ct. 423, 72 L. Ed. 770, and the latest pronouncement on the chain store tax situation, Liggett Co. v. Lee (1933) 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699, both opinions by a strongly divided court. And, indeed, in the most recent decision of the Supreme Court in relation to a state tax (State of Minn. v. Blasius, 54 S. Ct. 34, 78 L. Ed. —, November 6, 1933), we have the somewhat unusual situation of that court upholding a certain application of a state tax law which the state court had previously held invalid (Id. [1932] 187 Minn 420, 245 N. W. 612) on the view that it constituted an illegal burden on interstate commerce. The state courts likewise, as revealed even by the most cursory examination of their decisions, have universally been diligent to sustain the validity of tax legislation wherever the possibility existed. Such also has been the language and the trend of our own decisions. See In re Limitation of Taxation (1893) 3 S. D. 456, 54 N.W. 417; In re Watson (1903) 17 S. D. 486, 97 N.W. 463, 2 Ann. Cas. 321; In re McKennan's Est. (1910) 25 S. D. 369, 126 N. W. 611, 33 L. R. A. (N. S.) 606; Id., on rehearing (1911) 27 S.D. 136, 130 N.W. 33, 33 L.R.A. (N.S.) 620, Ann.Cas. 1913D, 745; Queen City Fire Ins. Co. v. Basford (1911) 27 S. D. 164, 130 N. W. 44; Eastern Dak. Elec. Co. v. Kirlin (1925) 48 S. D. 462, 205 N. W. 33; State v. City of Sioux Falls (1932) 60 S. D. 330, 244 N. W. 365. It is, therefore, in the light of these principles and in recognition of their constant exemplification in the previous decisions of this and other courts, that we must approach the consideration of the specific problems here presented.

■ The statute involved in this proceeding presents a comprehensive and in some respects novel scheme of taxation. Certainly, so far as the law of this state is concerned, it is entirely a new thing. If the law is to be given effect according to its general tenor, it is apparent that its impact will fall directly upon every transaction within the reach of this state whereby money or its equivalent passes from one person or entity to another. At this point we may conveniently consider a somewhat technical objection to the validity of the statute which is urged in this case. The portion of the law making general imposition of tax appears to be the first paragraph of section 2, as hereinbefore set out. Plaintiff urges that this section really imposes the tax therein mentioned only upon non-residents of this state. Stripped of its grammatical non-essentials the section in question reads:

"* * * there is hereby annually levied upon every person, * * * located in or transacting business in the State of South Dakota, or receiving a gross income, as defined in this act, a tax with respect to his or its entire gross income * * * such tax being hereby levied for each taxable year * * * upon and with respect to the entire gross income * * * from all property owned, and from every business * * * carried on in this state by persons not residents of this state * * *."

That the construction urged by plaintiff is a possible one as a matter of English grammar must be conceded. Such a construction would be entirely contrary, however, to the actual legislative intention, as plaintiff freely admits, and we do not believe that it is the only possible construction of the language involved. We think that the portion of the section preceding the words "such tax being hereby levied for each taxable year, etc." would be sufficient, standing alone, to announce an imposition of tax upon persons located or transacting business in this state, and that the remainder of the section may be deemed the portion relating to non-residents. This construction might be more clearly required if the word "also" had been inserted in the phrase last quoted so that it read, "such tax being also hereby levied, etc.," but we think that it is a permissible construction of the language as it actually appears in the statute and we adopt it regardless of the grammatical possibility or even preferability of the construction urged by plaintiff, as a matter of giving effect to the admitted legislative intention.

■ In the resolution of the further contentions urged by plaintiff in this proceeding it will be of appreciable assistance if we can first ascertain with some degree of precision what sort or kind of tax law this is. The determination of the fundamental nature of various tax proposals has caused the courts no little difficulty. Of course divergent opinions on the point sometimes exist. But a considerable part of the confusion and apparent disharmony in the decisions seems traceable to the fact that it is almost impossible entirely to disassociate the economics of taxation from the law of taxation. This confusion is further contributed to by the fact that in tax matters the nomenclature of the economist differs appreciably from that of the constitutional lawyer and there is not yet in either field a standard terminology of general acceptance. Further, in passing judgment upon any tax law, the criteria of the economist differ essentially from those of the lawyer. The economist will concern himself primarily with the social policy of the measure, its probable utility, its equitable justice, and matters of that nature, and in arriving at his conclusions he will usually be influenced somewhat by the possibilities of the shifting of the proposed tax and its ultimate incidence. The lawyer, on the other hand, must approach the measure from an entirely different aspect. He cannot concern himself with its expedience or wisdom.

"The judicial tribunals of the state have no concern with the policy of legislation. That is a matter resting altogether within the discretion of another coordinate branch of the government. The judicial power cannot legitimately question the policy, or refuse to sanction the provisions, of any law, not inconsistent with the fundamental law of the state." In re Powers (1853) 25 Vt. 261.

"Constitutional interpretation * * * does not rest on individual leanings; neither can it rest on psychic antipathy to or affinity for the rule of social, economic, or political conduct involved in the act challenged." Gray v. Central Fla. Lbr. Co. (1932, Fla.) 140 So. 320, 323.

He is confined in the last analysis to the narrow question of constitutional validity and in determining that question and in ascertaining the legal nature of the tax he must arrive at his conclusions according to the primary impact of the tax as the law has placed it without regard to the economic possibility of a shift of the

tax to a divergent final incidence. This is not to say, however, that the lawyer can intelligently, or should, undertake the evaluation of a tax measure in entire disregard of its economic content and background. It is merely to say that in arriving finally at his conclusions as to validity he cannot employ the customary standards of the economist. In an effort, therefore, to arrive at our conclusions in this case without undue confusion of the economic and legal aspects of the proposed measure, and with the intention of avoiding any improper influence of the economic aspects upon our conclusions as to the legal nature and validity, we shall endeavor to consider first and separately the nature of the tax from an economic viewpoint.

From this aspect the statute before us lends itself most readily to classification. It is, we think, a general sales tax.

"During the last decade a new tax, known as the general sales tax, has been introduced in the tax systems of many nations, and has assumed a position of imposing importance in public finance. * * *

"The so-called 'general sales tax' is a tax imposed upon the sales of numerous commodities and the use of personal service at uniform rates. It may be laid upon total business turnover, as in France, where it is called a turnover tax; or it may be laid upon individual transactions, as in Belgium, where it is called a transfer or transactions tax. The general sales tax is frequently described as a general consumption tax because it is commonly supposed to be paid by consumers in higher prices for their purchases.

"The general sales taxes employed by approximately thirty nations during the last ten years may be classified according to the base of the tax, as follows:

"1. A tax upon sales in general. a. Imposed upon sales of commodities and services, as in Germany, and many other countries. b. Imposed upon sales of commodities only, as in Porto Rico.

"2. A tax upon producers' sales. a. Imposed at a uniform rate, as in Canada. b. Imposed at adjusted rates, as in Austria.

"3. A tax upon commodity sales at wholesale, as in Italy.

"4. A classified sales tax, as in West Virginia.

"5. A tax upon sales at retail, as in Kentucky.

"6. A hybrid tax, as in France, which combines taxes upon

sales of goods and services, special taxes on producers' sales, retail sales taxes, etc." Buehler, General Sales Taxation, 1 (Business Bourse, New York, 1932).

"The term, general sales tax, as commonly used, means a tax on the sale, exchange, or transfer of commodities, property, or services. The term, general turnover tax, is also used to convey the same meaning. For example, the sales taxes in France and Germany, which apply to a number of commodities and services, are known as turnover taxes. Usually in imposing a sales tax of a general nature the rate is applied to the turnover or gross receipts for a given period. In Belgium, however, the tax is imposed on the individual transaction and collected by means of stamps attached to each invoice and bill of sale.

"When the term, general sales tax, is used, it is not intended to convey the meaning that every type of commodity or service is included. Although taxes based upon sales are in effect in 26 countries, it is doubtful that a single example could be found where the tax applies to all sales or exchanges of commodities and services. In France, for instance, compensation for personal services in the form of salaries or wages and commodities sold by farmers are not included in the tax, and in Italy retail sales are not included.

"A general sales tax is sometimes referred to as a consumption tax, because it is assumed that it will be added to the price and thus paid by the consumer. When the sales of different classes of enterprises are taxed at different rates, as in West Virginia, the tax is sometimes referred to as a classified sales tax, if the tax is imposed only on the sale of commodities, as in Brazil, it may be described as a limited tax on commodities. A tax that applies generally to the sales of producers and manufacturers is frequently called a production tax. Examples of production taxes are found in Canada, Austria, and Turkey.

"The term, retail sales tax, is applied to a tax imposed on the sales made by retailers. The Kentucky sales tax is a retail sales tax.

"The term, selective sales tax, is now generally used to describe a tax imposed on the sales of a particular commodity or service, for example, motor fuel and admissions. If the articles or services selected for taxation are classified as luxuries, the

imposts are usually called luxury taxes. During the World War, for example, luxury taxes were imposed on the sale of soft drinks, theater tickets, expensive clothing, ·club dues, and so on.

"There are so many varieties of sales tax that caution must be used in the choice of nomenclature in order to prevent confusion of thought. When a sales tax does not fall clearly within the definition of accepted terms, the safest procedure is to refer to it by a title generally descriptive of its nature." Sales Taxes, General, Selective, and Retail, II (National Industrial Conference Board, New York, 1932).

It will be observed that from the viewpoint of the economist whenever the impact of a tax falls upon a business or pursuit or the sale of a commodity and is measured by the gross receipts thereof a sales tax arises. As more and more occupations and transactions are included within the tax law generality is approached and presently reached. The law now under consideration is so broad and comprehensive in its reach that it far exceeds the minimum requirements for generality and might indeed with propriety be denominated a universal sales or transactions tax. As to the wisdom, advisability or social justice of a general sales tax the economists and tax theorists appear to be in considerable disagreement. They are unanimous, however, in saying that this is a type of tax that tends to emerge in times of extreme financial stress. Mounting expenditures demand revenue; property values diminish; property taxes become an excessive burden and payments fall off. But "hard times" or not, whether the citizens in general are making any money or not, so long as the social structure exists, commodities and services must pass between citizens upon a money consideration, and if the state can appropriate for itself a small amount of each dollar that passes in transactions between its citizens every time, or substantially every time, a transaction is had a fairly certain and immediate source of revenue has been tapped. Save for the Spanish "alcavala" originating in the middle ages and persisting to some extent through Spanish influence in Mexico and the Philippine Islands into modern times, a sales tax approaching generality is (almost without exception) a creature of the last sixteen years. During that period, however, it has been much experimented with in Continental countries, beginning with Germany in 1916 and France in 1917. See Federal and State Tax Systems,

Fourth Edition, prepared under the direction of New York State Tax Commission (Commerce Clearing House, Chicago). Thus far, as a Federal matter, the United States has not seen fit to embark upon a general sales tax program, though one was proposed in 1862 and again discussed in Congress from 1918 to 1921 and in 1931. Some of the states, however, have enacted laws which amount, in substance, to general sales tax laws. These have usually been developments from specific sales taxes or from various occupational taxes. In the State of Mississippi, for instance, there has been known to the law for many years a system of "privilege taxes" which required the payment of an annual license fee, usually at a fixed flat rate, for the privilege of engaging in specified business and occupations. Various businesses have been added to the list from time to time, and in 1930 (Ch. 88, Laws 1930) there was a recodification and reenactment of the law of the subject, and at the same time (Ch. 90, Laws 1930) a law was enacted imposing a tax based on the percentage of gross receipts of business occupations and those personal services for the exercise of which license is required under the privilege tax law. Both statutes were revamped and reenacted in 1932 (Ch. 89, Ch. 90, Laws 1932). As other examples of state laws partaking to some extent of the nature of general sales tax laws existent today (or recently existent), some of which we shall have occasion to consider more fully hereafter, we may cite the following: Act No. 345, p. 283, Acts Ark. 1923, approved March 8, 1923; California Laws 1933, S. B. 1211; General Statutes Conn. (Revision 1930), c. 75, Secs. 1340, et seq.; Revised Code Del. 1915, 196 Sec. 159, as amended Ch. 23, 30 Del. Laws 1919; No. 427, Laws Ga. 1929, p. 103, Act August 29, 1929; Laws Ill. 1933, p. 924, Act approved June 28, 1933; (Smith-Hurd Rev. St. 1933, Ch. 120, § 440 et seq.); Chapter 50, Laws Ind. 1933, approved February 27, 1933; Ch. 149, Laws Ky. 1930, approved March 17, 1930; Laws Michigan 1933, No. 167; Ch. 427, Laws N. C. 1931, art. 2, § 164; Ch. 261, Laws N. Dak. 1933 (subjected to referendum and defeated at a special election September 22, 1933, 41,241 for and 113,807 against); Laws N. Y. 1933, Ch. 281; Ch. 400, p. 680, Laws Ore. 1933; No. 53, Acts Pa. Spec. Sess. 1932, approved August 19, 1932 (72 P. S. § 3282); Ch. 63, Laws Utah 1933, amended Ch. 20, Laws Utah Second Spec. Sess. 1933; Tax Code Va. (Appendix Va. Code 1930, p. 2177) § 188; Ch. 191, p. 869, Laws Wash. 1933; Ch. 33, Laws W. Va. 1st Extra Sess. 1933.

While considering the law in its economic phases it is perhaps well to note that, notwithstanding the appearance of the word "income" in the title of this act and at various places throughout the corpus of the act, it is not in any sense whatsoever an "income tax law" as the economist customarily employs that phrase. For the economist, as well as for the lawyer, the phrase "income tax law" signifies the type of act that is sometimes more definitely called a "net income tax law," wherein the measure of the tax (and possibly both the subject and the measure) is the net gain or profit of the taxpayer over a given interval of time. The true measure of the present tax is not income at all in any proper sense of the word, but gross receipts, a very different and much broader signification which this act itself undertakes, by definition in section 1 (g), to impose upon the phrase "gross income." It is extremely unfortunate that the word "income" should find a place in either the title or the body of a law of this type for it is entirely misleading (even if unintentionally so) and can only tend to confusion of thought. Henceforth, in this discussion we shall use the phrase "income tax" as signifying a net income tax and to designate the measure of the tax attempted to be set up in the present law we shall employ the term "gross receipts." The vital distinction from the economic standpoint between a tax measured by income and a tax measured by gross receipts is too apparent to require discussion. The economic base of an income tax is that the taxpayer has acquired ability to pay because over a given interval he has enriched himself and improved his fortunes. His operations have resulted in a net profit over and above his operating expenses. A gross receipts tax, on the other hand, finds its economic base on the necessity of consumption. The taxpayer, whether his operations are profitable or unprofitable in the aggregate, must have transactions and must have possession from time to time, however temporarily, of gross receipt dollars, a portion of which the state proposes to take.

We turn now to consider the nature of this tax from the legal, as distinguished from the economic, viewpoint and in connection therewith to ascertain, if we can, the broad general power of the legislature (disregarding at this stage of the case any questions as to classification, exemptions, or burdening of interstate commerce) to pass a taxing law of such nature as we may discover this law to be.

It is by no means as easy to determine the nature of this statute from the standpoint of the lawyer as it was from that of the economist. It is apparent that it was the intention to reach every gross receipt dollar coming to the hands of a resident of this state whether from transactions within or without the state, and also every gross receipt dollar originating in this state and moving to a non-resident of the state. In the effort to accomplish this desired result the statute "speaks a various language." It is phrased in part in the language of property tax, in part in the language of privilege tax, and in part in the language of income tax. We can gain little assistance from the decisions of other courts. We have discovered but two statutes in any considerable degree comparable with our own in structure and terminology. Upon one of them (Laws Ind. 1933, Ch. 50, approved February 27, 1933) we have been unable to find a judicial pronouncement. As to the other (Acts of Ark. 1923, p. 283, No. 345) it was very promptly held unconstitutional in toto (Sims v. Ahrens [1925] 167 Ark. 557, 271 S. W. 720) without any particular effort to analyze its precise legal nature save that a majority of the court said, without much discussion or consideration, that it was both an occupational tax and an income tax. It is conceivable that our statute might be, as its title and some of the language of the act itself would appear to indicate, a property tax upon the gross receipts dollar, as such. The acceptance of that theory, however, would mean the invalidation of the entire act because we would be immediately confronted with, not only double but multiple taxation of property, the entire taxable value of property sold being included in the gross receipts of sale and the gross receipts dollar being taxed as property, not once a year as other property, but over and over again every time it is received, put to work in any fashion and again returned to the taxpayer. It would seem entirely impossible therefore to sustain this law on the theory that gross receipt dollars are being taxed as property. It is conceivable, in the second place, that the law might be considered some kind of an income tax. As to the precise legal nature of an income tax the cases seem somewhat in disagreement. Some jurisdictions appear to hold that an income tax is a tax upon the property whence the income is derived (Hart v. Tax Comm. [1921] 240 Mass. 37, 132 N. E. 621). Others hold that it is a property tax upon the net income dollar itself as prop-

erty (Eliasberg Bros., etc., Co. v. Grimes [1920] 204 Ala. 492, 86 So. 56, 11 A. L. R. 300; State v. Pinder [1919] VII Boyce (30 Del.) 416, 108 Atl. 43). Other courts reject the theory that an income tax is a property tax of any kind (Ludlow-Saylor Wire Co. v. Wollbrinck [1918] 275 Mo. 339, 205 S. W. 196; Hattiesburg Groc. Co. v. Robertson [1921] 126 Miss. 34, 88 So. 4, 25 A. L. R. 748). So far as concerns an income tax on corporations, it seems everywhere to be regarded as an excise tax imposed upon the privilege of corporate existence (Flint v. Stone Tracy Co. [1911] 220 U. S. 107, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312). And some courts . seem to take the position that an income tax is sui generis—that it is simply an income tax (State ex rel Bolens v. Frear [1912] 148 Wis. 456, 134 N. W. 673, 135 N. W. 164, L. R. A. 1915B, 569, 606, Ann. Cas. 1913A, 1147). See generally on the nature .of income tax, 11 Va. Law Rev. 607; 37 Harv. Law Rev. 1; 44 Harv. Law Rev. 1075; 12 Minn. Law Rev. 683; 17 Minn. Law Rev. 127; 3 Rocky Mt. Law Rev. 132; 5 Rocky Mt. Law Rev. 70). In any event, however much the cases may be in disagreement as to the precise nature of an income tax, the whole law of the subject is based' absolutely on the view that the dollar concerned (whether it be deemed the subject of a tax or the measure of a tax) is the net income dollar, that is, it is an addition to or increment of capital or principal as distinguished from the capital itself. As we mentioned in discussing the nature of this tax from the economic viewpoint, that idea is inherent in the very word "income." See Lynch v. Turrish (1918) 247 U. S. 221, 38 S. Ct. 537, 62 L. Ed. 1087; Doyle v. Mitchell Bro. Co. (1918) 247 U. S. 179, 38 S.Ct. 467, 62 L.Ed. 1054; Eisner v. Macomber (1920) 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A.L.R. 1570. Cf. also, Note, Ann. Cas. 1913C, 984; 13 Minn. Law Rev. 637, 32 Harv. Law Rev. 587. Under an income tax law the net income dollar is taxed once a year and it is a dollar that the taxpayer did not have at the last taxing date and with reference to which he has not previously been taxed. Under the present law, the gross receipts dollar includes the return of invested capital as well as the gain or profit, if any, thereon and it is taxed, not annually, but whenever and as often as it appears. Net income dollars are homogeneous and directly indicative of ability to pay, being representative of a gain or profit. Whenever a taxpayer acquires a net income dollar his

financial ability to assist in the burden of government is thereby increased and it is increased very much in the same degree as that of any other taxpayer who has likewise acquired a net income dollar. Gross receipt dollars, on the other hand, are heterogeneous. Five thousand of them may pass through the hands of one taxpayer in a year resulting in a net gain or profit of one thousand dollars. Fifty thousand of them may pass through the hands of another taxpayer in the same period of time and his operations for the year may show a loss. They reflect merely volume of transactions and are no index whatsoever of resultant ability to pay. The gross receipts dollar is utterly and essentially different from the net income dollar and a dollar that is, in fact, a gross receipts dollar (as are the dollars referred to in the present statute by specific definition) cannot be changed in nature by changing its name to "gross income dollar" even though the legislature of South Dakota preside at the christening. It seems entirely clear therefore that this statute cannot be sustained as an income tax in any sense of the word, nor as a tax upon or with reference to the gross receipts dollar as such.

It remains to inquire therefore whether the law may be sustained in whole or in part on the theory of what is customarily denominated a privilege tax, in view of the fact that portions of the law, particularly § 2, subds. (a), (b), (c), (d), and (e), appear to speak, at least in part the customary language of a tax imposed by the state upon the privilege of engaging in a business, occupation or pursuit. Here we enter a field where a highly developed conceptualism plays a more important part, perhaps, than anywhere else in the domain of the law. In a despotism the mere fact that the monarch imposes a tax upon the subject is its own complete justification and explanation. Under our form of government, however, the situation is quite different. The free democratic state must have revenue for its needs as well as the despotic monarch and that revenue must be furnished by the citizen just as it was by the subject. It is not consonant with our ideas, however, that private property of the citizen should be taken for any need of the sovereign state without compensation, and in the field of taxation, therefore, to satisfy our type of thinking, we have undertaken to build up with reference to every tax exaction by the state a concept of some sort of consideration or quid pro quo

moving from the state to the taxpayer. In the case of an ad valorem property tax spread at a uniform rate throughout the taxing district this is not difficult. We find the consideration for the exaction in the protection afforded by the organized state to the property and to the ownership thereof. Early in the history of "government by consent of the governed," however, it became apparent that it was not suitable, and perhaps not always possible, to depend upon the ad valorem tax on tangible property as the sole source of governmental revenue. Constitutional restrictions on property taxation were narrow and confining, and it was discovered more and more often as the economic and social structure increased in complexity that it was frequently wise, expedient, and just to impose a tax exaction upon certain groups which was not imposed on other groups, or upon different groups in different amounts, and to justify this practice there presently arose the legal concept of taxable privilege and the distinction between the subject of a tax and the measure of a tax. If it seemed socially expedient that grocers in a state, for example, should bear a greater share of the tax burden than was represented by the proceeds of the general ad valorem property tax upon their property and should, in fact, contribute a portion of their business revenue to the public coffers the proposal was adequately validated by means of the concept of privilege. Grocers, of course, could not be taxed at a higher rate on their property than were other citizens, but the procedure was to exact from them a portion of their business receipts, whereupon it was said that the subject of the tax was the privilege of engaging in the grocery business and the measure thereof a percentage of the gross receipts. This concept of taxable privilege as the consideration moving to a class or group of taxpayers in return for a particular exaction imposed upon them as distinguished from others is the basic groundwork of all our personal, license, excise, occupation, and privilege tax law and it has developed to a degree almost amazing. There is inherent in the very word "privilege" the idea of something apart and distinct from a common right which pertains to all citizens or exists in all subjects. It connotes some sort of a special grant from sovereignty, some type of necessary special permission or consent which the sovereign in its discretion might have withheld or failed to provide, such as the right to do business as a corporation or the right to record a mortgage.

In a few states the term privilege, in the sense of taxable privilege, is still limited, by virtue of particular constitutional provisions and a course of judicial decisions, to that narrower conception of a special grant or permission from the state as distinct from a matter of common right which all citizens are entitled to enjoy. Such seems to be the rule in Massachusetts (O'Keeffe v. City of Somerville [1906] 190 Mass. 110, 76 N. E. 457, 112 A. S. R. 316, 5 Ann. Cas. 684; Gleason v. McKay [1883] 134 Mass. 419). So also in Arkansas (Sims v. Ahrens [1925] 167 Ark. 557, 271 S. W. 720; Stevens v. State [1840] 2 Ark. 291, 35 Am. Dec. 72). And in New Hampshire (Opinion of the Justices [1927] 82 N. H. 561, 138 A. 284; State v. United States & C. Express Co. [1880] 60 N. H. 219). Elsewhere, however, the concept of taxable privilege has not been so limited and has expanded most remarkably. "The term 'privilege' embraces any and all occupations that the legislature may in its discretion choose to declare a privilege and tax as such." Seven Springs Water Co. v. Kennedy (1927) 156 Tenn. 1, 299 S. W. 792, 793, 56 A. L. R. 496. A single act may be a taxable privilege. Ogilvie v. Hailey (1918) 141 Tenn. 392, 210 S. W. 645. And a taxable privilege may consist of any occupation, business, employment or the like affecting the public which the legislature sees fit to denominate as such. Western Union, etc., Co. v. State of Kansas (1910) 216 U. S. 1, 30 S. Ct. 190, 54 L. Ed. 355. This court is already committed to the conception of taxable privilege in its broader sense.

"It appears to be the concurrent voice of all the authorities that in the absence of any inhibition, express or implied, in the Constitution the legislature has power to either directly levy and collect license taxes *on any business or occupation* or to delegate like authority to a municipal corporation." In re Watson (1903) 17 S. D. 486, 97 N. W. 463, 464, 2 Ann. Cas. 321.

The concept is not entirely artificial, particularly so long as the privilege taxed is rather narrowly specific and the measure of the tax upon the privilege is a flat rate, as, for example, taxing all vendors of cigarettes one hundred dollars per year. However, when the measure of the tax is made a percentage of the gross receipts of the privileged class and the class is made extremely broad and inclusive the artificiality of the concept appears to increase. When, as is the case under some statutes, the class is

made so comprehensive as to embrace all vendors of tangible property, whether by wholesale or at retail, and the tax exaction is a percentage of their gross receipts, it requires an appreciable intellectual effort to accept the view that, as a matter of law, the state is not taxing the gross receipt dollars of business, but that the subject of the tax is the privilege of engaging in the business of vending tangible property by wholesale or at retail and the percentage of gross receipts exacted is merely the measure of the tax. The great majority of courts called upon to deal with such a situation appear to have had no difficulty in pressing the concept of privilege to that degree or in arriving at that result.

It would appear, therefore, that, though this statute cannot reach the gross receipts dollar merely by calling it an income dollar or by imposing a tax upon it as such, it may be possible nevertheless, by virtue of the privilege concept, to reach the gross receipt dollar to some extent as the measure of the amount of a legitimate tax upon a privilege. So far as we have been able to discover, the states (excepting Arkansas and Indiana mentioned above) that have sought to adopt what the economist would call a general sales tax have made use of the privilege concept, and, insofar as such laws have been sustained by the courts, it has been upon the theory of privilege tax.

In 1929 the Georgia legislature passed an act (No. 427, Ga. Laws 1929, p. 103) "to provide for the raising of public revenue by a tax upon the privilege of engaging in certain occupations and by a tax upon certain business and commercial transactions and enterprises." The act was inclusive in its terms as to businesses thereby affected inasmuch as it contained a section, following upon the specific taxation of divers business enterprises, imposing a tax "upon every person engaged or continuing within this state in any and every business not included in the preceding sections." (§ 7.) The amount of the tax in every instance was determined in accordance with the gross receipts of the business affected. Although the act expired by its own terms in 1931 (and apparently was not reenacted) yet it was before the Supreme Court of the state in two cases and, so far as concerns the nature of the statute, the court held that it was an excise tax on the privilege of doing business, the privilege being the subject of the tax and the gross receipts the measure thereof. Norman v. S. W. Ry. Co. (1931) 42 Ga. App.

812, 157 S.E. 531, 533; Ga. Paper Stock Co. v. St. Tax Bd. (1932) 174 Ga. 816, 164 S. E. 197.

The Illinois legislature in March, 1933, passed an act, approved March 22, 1933 (apparently not included in the official laws of the session, but set out in full in the opinion hereinafter mentioned), which undertook to impose "a tax upon persons engaged in the business of selling tangible personal property at retail." The act did not attempt to reach any other businesses, occupations, trades, or professions, and the Supreme Court, in considering the statute in the course of an opinion which we shall later have occasion to consider further on another phase of this case, held, so far as concerns the nature of the taxing act in question, that it was an occupational tax, the subject of the tax being the business or privilege of engaging in the business of selling tangible property at retail, the gross receipts of such business being the measure of the tax. Winter v. Barrett (1933) 352 Ill. 441, 186 N. E. 113.

Kentucky in 1930 (Ch. 149, Ky. Acts 1930, p. 475) adopted a statute "imposing an excise or license tax on retail merchants" requiring a license "for opening, establishing, operating, or maintaining of any store" (section 2), the tax being measured by a percentage of gross receipts ranging from one-twentieth of one per cent on the first four hundred thousand dollars and graduated up to one per cent on the excess of gross sales over one million dollars. In a proceeding to test the constitutionality of the act the Supreme Court of that state spoke of it as "a gross sales tax." They said that it was an excise or license tax upon the privilege of engaging in the occupation of retail merchandising, such business or privilege being the subject of the tax and the gross receipts the measure thereof. Moore v. State Bd. (1931) 239 Ky. 729, 40 S. W. (2d) 349.

The State of Pensylvania is almost alone in having had what the economists would call a sales tax approaching any degree of generality prior to 1923. Pennsylvania has had a system of license or privilege taxation of the business of merchandising since 1821 and since 1830 the measure of the tax, to some extent at least, has been the amount of gross sales (see Commonwealth v. Pocono Mt. Ice Co. [1903] 23 Pa. Super. Ct. 257). In 1899 the Pennsylvania law was revamped and reenacted (No. 118, P. L. Pa.

1899, p. 184) by a statute "imposing a mercantile license tax on vendors of or dealers in goods, wares and merchandise." The measure of the tax was made a flat annual license fee of two dollars plus "one mill additional on each dollar of the whole volume gross of business transacted annually" for retail merchandising, and for wholesalers an annual flat rate of three dollars plus one-half mill on each dollar of gross sales, and for dealers at exchanges or boards of trade a tax of twenty-five cents on each thousand dollars gross sales. The whole language of the act sounds in privilege or occupational taxation. An Attorney General's opinion (New Mercantile Tax Law [1900] 3 Dauph.Co.R. 61, 9 Pa. Dist. Rep. 117) states that the law is a mercantile license tax, as were the previous laws of similar nature. And the Supreme Court subsequently took the same view (Knisely v. Cotterel [1900] 196 Pa. 614, 46 A. 861, 50 L.R.A. 86) calling the law a "mercantile license tax" and holding that it was not a property tax but that the subject of the tax was the business or the privilege of engaging in business and that the gross proceeds of sale constituted merely the measure of the tax. (For a subsequent and perhaps more comprehensive sales tax in Pennsylvania, which appears not yet to have received any judicial construction by the court of last resort, see No. 53, Laws Pa. Spec. Sess. 1932, p. 92 [72 P. S. § 3282] sub. nom. "Emergency Relief Sales Tax Act.")

The Legislature of Washington (Ch. 191, Laws Wash. 1933, p. 869) enacted a statute "imposing taxes upon the privilege of engaging in business activities" which was very comprehensive in terms as originally drafted though a portion thereof was stricken by gubernatorial veto. The constitutionality of the statute was sustained by the Supreme Court by a divided opinion (State ex rel Stiner v. Yelle [1933, Wash.] 25 Pac. (2d) 91). As to the nature of the tax, the majority of the court were of the view that it was in the nature of an excise tax, the subject of the tax being "the privilege of engaging in business and gainful pursuits under the protection of our laws," the measure of the tax being gross receipts. Of the four dissenting justices two were of the opinion, under the peculiar and extremely broad definition of the word "property" in the Washington Constitution that the statute was a property tax on gross receipts as such, the other two agreeing with the majority of the court as to the nature of the tax.

It seems to be the rule therefore, to the extent that any authority exists dealing with statutes in any respect comparable, that the general sales tax of the economist is for the lawyer a tax in the nature of an excise or license or privilege tax, the subject being businesses, occupations, professions, etc. (or the privilege of engaging therein) and the measure of the tax being gross receipts. The scope of our law, so far as concerns the number of businesses, vocations, pursuits, and professions affected, is broader than the laws under consideration by the courts in any of the cases last above cited excepting only the State of Georgia, and in the decisions in that state no point was made of the universality of the law's application. The difference in that regard, however, is, we think, merely one of degree and not of kind. When a state taxes indifferently the privilege of engaging in every conceivable occupation, pursuit, or profession, and measures the tax by the gross receipts thereof, it seems that the legal subject of the tax and the legal measure of the tax have really reached coincidence and it becomes quite difficult to maintain the concept that the subject of the tax is the privilege of engaging in any business, profession, or occupation whatsoever and the gross receipts the measure thereof. However, as we have heretofore said, whenever taxable privilege is construed as a term broad enough to include a matter of common right pertaining to every citizen, such as the acquisition of a livelihood by means of engaging in a business or vocation not subject to police power regulation, and an exaction is imposed thereon solely for purposes of revenue, measured by the amount of gross receipts, at that very moment the concept that the subject of the tax is the privilege or occupation and not the gross receipts dollar becomes highly artificial. And if the validity of that artificial concept be once conceded, as a matter of law (and it is conceded excepting by a few courts who deem that their Constitutions prevent it), then we are unable to see that such validity is destroyed by extending the application thereof from the particular to the universal. We arrive therefore at the conclusion that this law may be sustained, in part at least, as an excise or privilege tax upon all businesses, pursuits, professions, trades, vocations, and callings (or the privilege of engaging therein), as a tax subject, the gross receipts being the measure of the tax. Assuming this to be the nature of the tax, there can be no possible question (ex-

cluding for the present any questions of classification, exemption, interstate commerce, etc.) as to the general legislative power to enact it, section 2 of article 11, of our Constitution, as amended in 1918, affirmatively authorizing the legislature to impose taxes upon occupations. We think the word "occupation," as used in that constitutional provision, is an extremely broad term sufficient to include any business, trade, profession, pursuit, vocation, or calling. We also think that to impose a tax upon an occupation is exactly the same thing as to impose a tax upon the privilege of engaging in an occupation. The two phrases differ slightly in verbiage but are identical in meaning.

It is apparent, however, from the rules and regulations issued by the director of taxation with the approval of the attorney general concerning the law in question (Bulletin No. 20, June, 1933) and from the blanks furnished by the director of taxation to taxpayers generally for the purpose of making return of taxable receipts (the contents of which regulations and return forms we think we may judicially notice) that it is the construction placed upon the act by the director of taxation and the attorney general that gross receipts taxable thereunder include all receipts of the citizen whether received in the course of or incident to some business, vocation, profession, or calling, or not. To illustrate, if a man, engaged exclusively and entirely in the business or occupation of wholesale grocer, happened to own an automobile, not employed in any manner in his business but merely for the private pleasure and convenience of himself and his family, and if desiring to purchase for his private and personal use a new automobile, he sold his old one for three hundred dollars (not being engaged in any proper or general sense in the business or occupation of selling second-hand automobiles, but merely as an isolated and casual assertion of the right of ownership over his own property) the director of taxation would construe that three hundred dollars to be a taxable gross receipt. If we understand the departmental construction correctly, the taxpayer in question would pay a tax of one-fourth of one per cent upon the gross receipts of his wholesale grocery business (Act, § 2, subd. b) but upon the three hundred dollars received for his second-hand automobile he would pay one per cent (Act, § 2, subd. e), and if this same wholesale grocer happened in his purely personal and private capacity to be

the owner of a quarter section of farm land, for which he was able to secure an annual rental of one hundred dollars, the rent money, according to the departmental construction, would be a' gross receipt for tax purposes in like fashion as the proceeds of the automobile. The same situation would arise if our wholesale grocer, owning his family home distinct and separate from his business premises, sold it, receiving cash therefor, or if our wholesale grocer happened to be a stockholder in a manufacturing corporation and a partner in a retailing business (which corporation and which partnership were taxable and paid tax on the gross receipts of their respective businesses) and received a dividend from the corporation or a distribution of profits from the partnership. So far as the grocer is concerned, none of the receipts mentioned would accrue to him as gross receipts of his engagement in a business, yet under the departmental construction they would be taxed. It seems entirely probable that the language of the act as it stands is broad enough to justify this construction placed thereon by the director of taxation. Manifestly, however, to the extent that the act may purport to reach the gross receipt dollars of the taxpayer which accrue to him in any fashion other than as the result of a transaction in the course of or necessarily incident to a recognized occupation, pursuit, profession, or calling, it cannot rest on the foundation that the subject of the tax is the privilege of engaging in an occupation, pursuit, profession, or calling, and the receipts of such occupation, pursuit, profession, or calling, are the measure of the tax. It is too clear for argument that if you are taxing the privilege of engaging in occupations and measuring the tax by the receipts thereof, before you can have any tax at all, you must first have the engagement in an occupation. The mere fact that the taxpayer has acquired a gross receipt dollar is not enough—it must appear that he acquired it as the result of a transaction in the course of or necessarily incident to one of the taxed occupations. This was very clearly pointed out by the Supreme Court of Georgia in one of the cases above cited with reference to the Georgia Act before mentioned (No. 427, Ga. Laws 1929, p. 103). In the Georgia law (section 1) the definition of gross receipts was substantially as broad and all-inclusive as in our law. There, also, as in our law, the precise allocation of the tax and the fixing of the amount thereof was in the language of occupa-

tion tax and the imposition was made upon "every person engaging or continuing within this state in the business of, etc., etc.," just as is the case in our own law [Sec. 2, subd. (a) to (e)]. Section 5 of the Georgia law imposed a tax upon every person engaging or continuing (inter alia) in the railroad business. The Southwestern Railroad Co. had leased its railroad properties in Georgia to the Central of Georgia Railway Co. The court held that the Southwestern Railroad Co. was not taxable upon such rentals, pointing out that the statute was a privilege tax upon occupations and that unless there was an exercise of the occupation there could be no tax. The court said in part:

"The plaintiff is not liable unless it was engaged in doing business within contemplation of the statute. If it was not so engaged, the magnitude of its business or receipts is immaterial. On the other hand, it makes no difference how small a business it may have carried on, provided its gross receipts exceeded the exemption (see section 8), if it in fact did engage in business. In the former case it would be non-taxable; in the latter, taxable."

—and with reference to the broad provisions of the definition of gross receipts the court pointed out that such definition could not control the question of whether or not there was in fact an engaging in business, saying:

"The language, 'all receipts, actual or accrued, by reason of the investment of the capital of the business engaged in, including interest, discount, rentals, royalties, fees, or other emoluments, however designated,' does not enlarge the meaning of the term 'business,' but simply provides that, where a business is in fact engaged in, then its gross receipts shall include all receipts, actual or accrued, by reason of the investment of the capital of such business, such as interest, discounts, rentals, royalties, fees, or other emoluments, however designated." Norman v. Southwestern R. Co. (1931) 42 Ga. App. 812, 157 S. E. 531.

If the gross receipts of the taxpayer in his purely individual and personal capacity, other than the wages or salary of employment, or the gross receipts which accrue because of being engaged in an occupation or as a necessary incident thereof, are to be reached by this law, it is obvious that the taxable privilege deemed to be the subject of tax under the act must be expanded to something broader and more inclusive than the privilege of engaging

in a business, pursuit, occupation, etc. The conception would have to be indulged, not merely that engaging in a business or occupation was a taxable privilege, but that the mere having of any conceivable sort or type of transaction of any nature whatsoever resulting in the acquisition of a gross receipt dollar amounted to a privilege which could be recognized and dealt with as a distinct entity and made the subject of a tax. It would require the view that every dealing by an owner with his own property, whether in the course of or necessarily incident to an engaging in the business or occupation of such type of dealing or not, was a taxable privilege. Though the courts have gone far with the concept of taxable privilege, they have refused to extend it to any such point as this and have held that when this point is reached the concept has become so utterly fictitious that it can no longer serve as a legal screen to hide the fact that the tax imposition is really upon the receipt which is nominally made the measure of the tax. The courts have therefore said that it is not permissible by any fiction of privilege to tax in fact the mere right of ownership of property or the legal incidents thereof. So far as concerns ownership and its incidents, the taxpayer in theory compensates the state for all benefits he receives in relation thereto when he pays his ad valorem property tax. A necessary incident of ownership is absolute dominion over the property and the right of the owner to "use it or dispose of it according to his pleasure subject only to general laws." (Sec. 265, R. C. 1919.) To tax the owner of property for engaging in the business of selling his property approaches closely to the permissible line. To tax the owner upon the privilege of selling or renting his property per se passes beyond the line. The distinction may seem tenuous, but it is nevertheless discernible. In the one case, you have both the element of an owner dealing with his property and the element of engaging in a business or occupation of such dealings. In the other case, you have the first element only. And the courts have held, in substance, that when it comes to the matter of dealings with property by the owner thereof the element of being engaged in a business, occupation, trade, vocation, or calling of making such dealings is essential to validate the concept of a taxable privilege. See Dawson v. Ky. Distilleries & Warehouse Co. (1921) 255 U.S. 288, 41 S.Ct. 272, 65 L.Ed. 638; Thompson v. Kreutzer (1916) 112 Miss, 165, 72 So. 891.

Cf. also, McCoach v. Minehill, etc., Co. (1913) 228 U. S. 295, 33 S. Ct. 419, 57 L. Ed. 842; U. S. v. Emery, etc., Co. (1915) 237 U. S. 28, 35 S. Ct. 499, 59 L. Ed. 825; Oliver Iron Mining Co. v. Lord (1923) 262 U. S. 172, 43 S. Ct. 526, 529, 67 L. Ed. 929, wherein the court by Mr. Justice Van Devanter distinguished that case from that of Dawson v. Ky. Distilleries & Warehouse Co., saying:

"Mining is a well recognized business wherein capital and labor are extensively employed. This is particularly true in Minnesota. Obviously a tax laid on those who are engaged in that business, and laid on them solely because they are so engaged, as is the case here, is an occupation tax. It does not differ materially from a tax on those who engage in manufacturing. Stratton's Independence v. Howbert, 231 U. S. 399, 414, 34 S. Ct. 136, 58 L. Ed. 285; Stanton v. Baltic Mining Co., 240 U. S. 103, 114, 36 S. Ct. 278, 60 L. Ed. 546. The plaintiffs regard Dawson v. Kentucky Distilleries & Warehouse Co., 255 U. S. 288, 41 S. Ct. 272, 65 L. Ed. 638, as making the other way. But that case is not in point. The tax there considered, as the opinion shows (255 U. S. 292-294, 41 S. Ct. 272, 65 L. Ed. 638), was not laid on any business, but on the mere exertion by an owner of distilled spirits of his right to withdraw them from a bonded warehouse, and had 'none of the ordinary incidents of an occupation tax.' "

We are therefore of the opinion that gross receipts accruing to an owner merely by reason of his private or personal use of his own property or his disposition thereof, whether by sale or rental (absent the element of being engaged in the disposition of property as an occupation or business), are not taxable under this act; nor are any other gross receipts which come to the taxpayer but which do not accrue to him from or as necessarily incidental to his engagement in a business or occupation. What constitutes an exercise of the taxable privilege of being engaged in a business, occupation, trade, profession, or calling may in some instances be rather a close question upon the facts, but if and when such a question arises it will not, we think, be found very difficult of solution, and we see no occasion to undertake to deal specifically or precisely with that point in this opinion.

　　　Believing the statute a valid exercise of legislative power to the extent that it can be deemed to impose a tax, the subject where-

of is the engaging in businesses, occupations, pursuits, etc., and the measure whereof is the gross receipts of such engagement, we come to the question of the sufficiency of the title. Plaintiff most earnestly contends that the title "An Act imposing a tax on gross incomes" does not adequately foreshadow either an act imposing a tax on gross receipts (plaintiff maintaining that gross income and gross receipts are by no means synonymous according to common usage and understanding and that the definition in the body of the act cannot be looked to for the purpose of aiding or enlarging the title) or an act imposing a tax upon occupations and measuring the tax either by gross income or gross receipts. There is much force in these contentions. The title is most inept. After considerable hesitation, however (and perhaps somewhat unduly influenced by our extreme reluctance to invalidate a revenue act because of a defect in the title), we have decided that it is legally sufficient. We agree with plaintiff that, in any proper manner of speaking and in accordance with general understanding, gross receipts are a very different thing from income. We agree further that the definition in the act cannot aid the title. We have discovered, however, that there appears to have developed to some extent in the drafting of tax laws in very recent years a practice of employing the phrase "gross income" and then defining it to mean, in substance, "gross receipts." We think this is a practice to be deplored and that it makes for an inaccurate and misleading terminology in tax law, but we must nevertheless recognize its existence. We have found the phrase "gross income" thus used and defined in statutes prior to our own in Connecticut, Arkansas, Mississippi, and Pennsylvania, as well as in several statutes passed almost contemporaneously with ours. So far as concerns the fact that the title announces a tax imposed upon gross income and not a tax on occupations measured by gross income, we do not believe this is necessarily harmful. As we have hereinbefore pointed out at length the distinction between taxing the income of a business and taxing the privilege of engaging in the business, adopting the income as the measure of the tax, amounts almost to a legal fiction. The final and practical result is identical in either case. The tax comes out of the same dollar and we do not believe it is requisite that the title correspond to this degree of technical legal precision. The instant title is a broad one as distinguished from an index

title. Under all these circumstances, it is not impossible to believe that a citizen or legislator reading the title to this act in February, 1933, might reasonably be deemed to be put upon notice as to whether there might not be foreshadowed by such title a tax either imposed upon or measured by gross receipts. We hold therefore that the title is sufficient.

Having determined the sufficiency of the title to the act and having arrived at the nature of the tax and the constitutional validity thereof subject to the limitations and to the extent hereinbefore indicated, we come to deal with sundry other objections urged by plaintiff. It is argued that that portion of section 1, art. 11, of the Constitution, which reads as follows:

"The legislature shall provide for an annual tax, sufficient to defray the estimated ordinary expenses of the state for each year, not to exceed in any one year two mills on each dollar of the assessed valuation of all taxable property in the state, to be ascertained by the last assessment made for state and county purposes."

—by implication prohibits the legislature from looking to any other source than an ad valorem property tax not exceeding two mills to meet "the ordinary expenses of the state." To that interpretation of the language just quoted we are unable to agree. Nor is such interpretation consonant with the amendment of section 2, art. 11, whereby the people expressly and affirmatively empowered the legislature to tax occupations, incomes, etc. Certainly it was intended to limit the ad valorem property levy for ordinary expenses of the state, but we do not believe that by any fair implication resort to other sources for revenue for state purposes is forbidden. A like response to a similar argument was made in Baker v. Hill (1929) 180 Ark. 387, 21 S. W. (2d) 867.

Plaintiff argues that sundry provisions of the act (for example, the last paragraph of section 2, the last paragraph of section 3, section 8, section 9, etc.) undertake to vest non-delegable legislative power or judicial powers in the director of taxation. It is undoubtedly true that legislative power cannot be delegated to him, nor can he be invested with judicial power, but we think we need not consider that question in this case. If any part or parts of the act attempt to vest legislative or judicial power in the director of taxation such provisions are, of course, invalid and any acts of the director of taxation thereunder will likewise be void and of no

effect, but the validity of the statute otherwise would not be impaired unless such void provisions went to the whole structure of the law or rendered it unworkable in their absence, which is not claimed to be the case here. It is apparent from an inspection of the rules and regulations promulgated by the director of taxation that they attempt in part to legislate and this is conceded by the attorney general upon the argument. Clearly legislation by the director of taxation is utterly void whether undertaken of his own motion or because he believes (whether rightly or wrongly) that the terms of the statute authorize it, but it is equally clear that the general validity of this statute cannot thereby be impaired.

Section 5 of the Act under consideration provides generally for payment of tax imposed in quarterly installments with an annual "clean-up" of items not earlier ascertainable. When the amount due from any taxpayer shall exceed an average of ten dollars per month the director of taxation is empowered in his discretion to require monthly estimates and payments. The act also provides for the withholding of the tax at the source in some instances, such as the payment of wages by employers and in case of the sales of products or commodities in bulk to a regularly established dealer in or buyer of such products (section 7), and requires withholders to remit and report accordingly. It is argued that these provisions constitute an invalid discrimination against those taxpayers who by withholdings at the source or monthly payment are required to part with their money in advance of the quarterly payment date, and also that requiring some persons to withhold taxes due from others and remit and report concerning the same is to force such withholders to act as tax-collecting agents or agencies for the public without compensation. We realize that this court in Ewert v. Taylor (1916) 38 S. D. 124, 160 N. W. 797, 804, announced a rule to the effect that requiring payment of certain taxes on or before March 30th, other taxes being payable half on April 1st and the other half on or before October 31st, necessarily resulted in inequality, the use of money being a thing of value, in which connection the court said:

"There is a fundamental difference between laws under which lack of uniformity and equality may arise owing to defects in human judgment, and laws which absolutely contravene the provisions of the Constitution by themselves creating a lack of unifor-

mity and equality. The mere fact that such lack of uniformity or equality may be slight cannot be considered in support of a law so inherently bad."

That was a pronouncement of this court made in a brief pragraph without discussion or citation of authority and in a case where the law being considered was manifestly unconstitutional upon several other (and, as it seems to us, vastly more important) grounds. We believe it the sound and only intelligent rule with reference to an administrative provision of this nature to determine the validity of the requirement according to its reasonableness under the circumstances. It may freely be conceded that to require payment of tax at an earlier date by some taxpayers than others in case of a general ad valorem property tax on real estate, the tax being a lien on the land, would be unreasonable and invalid. The instant case presents quite a different situation. Taxes will be due in small amounts from many taxpayers of very little financial responsibility, as, for example, transient laborers and wage earners. If such persons may be permitted to collect their wage in full with the expectation that they will make a report and remit a tax at the end of three months the opportunities for and probabilities of tax evasion are manifold. We doubt if the state is required to be so imprudent and over-liberal a creditor. If such administrative provisions in this kind of a law must be held invalid the probability of loss to the state by evasion of tax is considerable, the burden of which will necessarily fall in the long run on other taxpayers. On the other hand, if the provisions can be given effect the detriment to the individual taxpayer will be extremely slight. The amount of tax withholdings from the point of view of the individual taxpayer will not be large, although their aggregate will be important to the state, and payment in no case can be advanced by a period exceeding three months. We are unable now to assent to the declaration of the opinion in the Ewert case that " * * * The mere fact that such lack of uniformity or equality may be slight cannot be considered * * *." No tax law was ever framed or ever can be which is absolutely equal and uniform, and in recognition of that fact, to declare a tax law invalid for so relatively slight a lack of uniformity as may arise from these provisions appears to us an exaltation of form above substance. . This may be not an inappropriate place to reiterate our

adherence to the doctrine implicit in the language of Mr. Justice Holmes when he said in his dissenting opinion in the New York Theater Ticket Case (Tyson & Bro. United Theatre  Ticket Offices v. Banton [1927] 273 U. S. 418, 47 S. Ct. 426, 433, 71 L. Ed. 718, 58 A. L. R. 1236), "* * * that property rights may be taken for public purposes without pay if you do not take too much; that some play must be allowed to the joints if the machine is to work." We think this is a case where the mere possibility of a detriment relatively very slight to the taxpayer should be deemed outweighed for the public good, and we are unwilling to apply to this case the doctrine announced in Ewert v. Taylor. So far as concerns the putting of citizens to some degree of trouble and inconvenience by causing them to withhold taxes payable by others, remit the same, and report concerning them, the situation again is one where some slight degree of inconvenience may reasonably be required to be suffered by the individual for the public benefit. In a very similar situation in a comparatively recent case involving a taxing statute requiring dealers in gasoline to collect a tax thereon from purchasers and make monthly reports and remittances thereof, in response to the argument that such requirement subjected the dealer to appreciable trouble and expense, Mr. Justice Brandeis said:

"A short answer to this argument is that the seller is directed to collect the tax from the purchaser when he makes the sale; and that a State which has, under its constitution, power to regulate the business of selling gasoline (and doubtless, also, the power to tax the privilege of carrying on that business) is not prevented by the due process clause from imposing the incidental burden." Pierce Oil Corp. v. Hopkins (1924) 264 U. S. 137, 44 S. Ct. 251, 68 L. Ed. 593. Cf. also, Interstate Forwarding Co. v. Vinyard (1932,Tex.Sup.) 49 S.W.(2d) 403; Miller v. People (1924) 76 Col. 157, 230 Pac. 603, 39 A. L. R. 269. We are of the opinion that this act does not infringe constitutional rights of such persons as it requires to withhold tax due from others and remit and report concerning the same.

██ ██ Plaintiff argues further that the act imposes an unconstitutional burden upon interstate commerce. It is entirely plain from the language of subdivisions (a), (b), and (c) of section 2, and from the next to the last paragraph of section 2, that the act seeks

to collect a tax from manufacturers, wholesalers and cattle 'feeders or dealers with reference to the gross receipts of their transactions "regardless of the place of sale or the fact that deliveries may be made outside the state," and in the case of the mere shipping or transporting of products outside the state prior to making any sale thereof. It is further apparent from the deduction provisions of section 7, requiring the state and all its departments or agencies or governmental subdivisions to deduct the amount of tax before remitting the purchase price "on all purchases made from any person whether such person is a resident or non-resident of this state" at the rate of one percent, that the act attempts to reach the gross receipts from all commodities physically delivered in this state even though such delivery result from a sale made in interstate commerce.

It is, of course, clear law that the state cannot impose any tax in such fashion as to amount to a direct burden upon interstate commerce. The fact question of whether a particular statute by its operation and effect imposes such a direct and unconstitutional burden is not always easy of solution, but in the instant case it seems quite free from difficulty. An attempt to do precisely the same thing by means of language almost verbatim in a West Virginia Statute (Ch. 1, §2, Acts Extraordinary Session West Virginia 1925, amending Sec. 2a, Ch. 1J0, Acts 1921 reciting in this connection that "The measure of this tax is the value of the entire production in this state regardless of the place of sale or the fact that deliveries may be made to points outside of the state") was held unconstitutional by the West Virginia court with reference to transactions in interstate commerce in a very careful opinion with extensive citation of authority in Hope Natural Gas Co. v. Hall (1926) 102 W. Va. 272, 135 S. E. 582, (affirmed on appeal, Id. [1927] 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049). To the same effect see State v. Albert Mackie Co. (1918) 144 La. 339, 80 So. 582; and American Mills Co. v. Doyal (1933) 46 Ga. App. 236, 167 S. E. 312. The final arbiter in this matter is, of course, the Supreme Court of the United States. Their position in this regard may not have been entirely consistent at all times and to reconcile all their decisions regarding it might be a task of some difficulty. Cf. State Tax on Ry. Gross Receipts (1872) 15 Wall. 284, 21 L. Ed. 164; Philadelphia, S. M. Steamship Co. v. Pennsylvania (1887)

122 U. S. 326, 7 S. Ct. 1118, 30 L. Ed. 1200; State of Maine v. Grand Trunk Ry. (1891) 142 U. S. 217, 12 S. Ct. 163, 35 L. Ed. 994; Galveston, etc., Ry. v. State of Texas (1908) 210 U. S. 217, 28 S. Ct. 638, 52 L. Ed. 1031. See also XXVI Col. Law Rev. 939; and a most interesting and able series of articles by Professor Powell under the title "Indirect Encroachment on Federal Authority by the Taxing Powers of the States" in 31 Harv. Law Rev. 321, 572, 721, 932; 32 Harv. Law Rev. 234, 374, 634, 902. But, whatever the previous holding may have been, since the decision in Crew Levick Co. v. Pa. (1917) 245 U. S. 292, 38 St. Ct. 126, 62 L. Ed. 295, reversing Commonwealth v. Crew Levick Co. (1917) 256 Pa. St. 508, 100 Atl. 952, the position of the Supreme Court with reference to state attempts to measure an excise tax by the gross receipts of sales in interstate commerce seems very clear. While conceding that the gross earnings in interstate commerce may be taken into consideration as an index to property value in computing property tax on property within the state and that in some cases a tax on gross receipts of interstate commerce if not excessive in amount may be imposed in lieu of a property tax on property within the state, nevertheless the rule is very clearly laid down in the Crew Levick Case that the attempt to measure the amount of a state privilege tax by gross receipts of sales made outside the state creates an unconstitutional burden upon interstate (or foreign) commerce. The case involved the Pennsylvania law of 1899, to which we have previously herein referred, imposing a mercantile license tax on wholesale vendors of goods. The defendant was a Pennslvania corporation buying and selling petroleum products with its principal place of business in Philadelphia. During the year 1913 it sold products at wholesale within the State of Pennsylvania to the gross amount of $47,000 and to customers in foreign countries in the gross amount of $430,000, and the Supreme Court of the United States held that the Pennsylvania tax could not be imposed with reference to the gross receipts of $430,000. The doctrine was reiterated and the distinction between net income of interstate business and gross receipts of interstate business as a tax measure was pointed out and emphasized in U. S. Glue Co. v. Town of Oak Creek (1918) 247 U. S. 321, 38 S. Ct. 499, 501, 62 L. Ed. 1135, by the following language of Mr. Justice Pitney:

"The correct line of distinction is so well illustrated in two

cases decided at the present term that we hardly need go further. In Crew Levick Co. v. Pennsylvania, 245 U. S. 292, 38 S. Ct. 126, 62 L. Ed. 295, we held that a state tax upon the business of selling goods in foreign commerce, measured by a certain percentage of the gross transactions in such commerce, was by its necessary effect a tax upon the commerce, and at the same time a duty upon exports, contrary to sections 8 and 10 of article I of the Constitution, since it operated to lay a direct burden upon every transaction by withholding for the use of the State a part of every dollar received. On the other hand, in Peck & Co. v. Lowe, 247 U. S. 165, 38 S. Ct. 432, 62 L. Ed 1049, we held that the Income Tax Act of October 3, 1913, c. 16, § 2, 38 Stat. 166, 172, when carried into effect by imposing an assessment upon the entire net income of a corporation, approximately three-fourths of which was derived from the export of goods to foreign countries, did not amount to laying a tax or duty on articles exported within the meaning of art. 1, § 9, cl. 5, of the Constitution. The distinction between a direct and an indirect burden by way of tax or duty was developed, and it was shown that an income tax laid generally on net incomes, not on income from exportation because of its source or in the way of discrimination, but just as it was laid on other income, and affecting only the net receipts from exportation after all expenses were paid and losses adjusted and the recipient of the income was free to use it as he chose, was only an indirect burden.

"The difference in effect between a tax measured by gross receipts and one measured by net income, recognized by our decisions, is manifest and substantial, and it affords a convenient and workable basis of distinction between a direct and immediate burden upon the business affected and a charge that is only indirect and incidental. A tax upon gross receipts affects each transaction in proportion to its magnitude and irrespective of whether it is profitable or otherwise. Conceivably it may be sufficient to make the difference between profit and loss, or to so diminish the profit as to impede or discourage the conduct of the commerce. A tax upon the net profits has not the same deterrent effect, since it does not arise at all unless a gain is shown over and above expenses and losses, and the tax cannot be heavy unless the profits are large. Such a tax, when imposed upon net incomes from whatever source arising, is but a method of distributing the cost of government,

like a tax upon property, and upon franchises treated as property; and if there be no discrimination against interstate commerce, either in the admeasurement of the tax or in the means adopted for enforcing it, it constitutes one of the ordinary and general burdens of government, from which persons and corporations otherwise subject to the jurisdiction of the States are not exempted by the Federal Constitution because they happen to be engaged in commerce among the States."

See, also, Sprout v. City of South Bend (1928) 277 U. S. 163, 48 S. Ct. 502, 72 L. Ed. 833, 62 A. L. R. 45. Cf. also, Peck & Co. v. Lowe (1918) 247 U. S. 165, 38 S. Ct. 432, 62 L. Ed. 1049; Alpha Portland Cement Co. v. Com. of Massachusetts (1925) 268 U. S. 203, 45 S. Ct. 477, 69 L. Ed. 916, 44 A. L. R. 1219.

The Supreme Court of the United States has not since departed from the doctrine of the Crew Levick Case and it is upon the doctrine of that case and subsequent similar decisions that the state courts of West Virginia, Louisiana, and Georgia, above cited, rely, and that doctrine must control in this case. The point seems so clearly and definitely established as no longer to be susceptible of controversy, at least until such time as the Supreme Court of the United States should indicate some other or different view, and it has exhibited no signs of doing so during the past fifteen years. It follows that so much of the law as attempts to impose a tax upon products or manufactures of this state sold outside the state or upon sales of South Dakota wholesalers made outside the state is entirely invalid. We may state parenthetically that we do not mean to hold that South Dakota cannot lawfully impose an occupation tax upon producers or manufacturers or wholesalers in this state merely because they sell their products outside the state, but we do say that this cannot be done by an act with a title such as the present act has, nor can it be done by making the gross receipts of sales outside the state the measure of the tax. It follows also that so much of section 7 as might be deemed to authorize the state, its departments, agencies, or governmental subdivisions to deduct tax on purchases where such purchases are in interstate commerce, is likewise invalid. It should be noted too that if the purchase is from a manufacturer or processor (sec. 2, subd. a) no greater amount of tax than one-fourth of one percent can lawfully be deducted even if the purchase is entirely an intrastate

transaction. The director of taxation should see to it that no unlawful withholdings are made in connection with public purchases even though the vendor does not object or tacitly consents. The portions of the act attempting to measure a tax by the gross receipts of transactions in interstate commerce (whether the transaction be by a resident of this state outside the state or by a nonresident in this state) being entirely invalid, we will defer for later consideration the question of whether that invaladity must be held destructive of the whole law.

We come now to the contention of plaintiff urged earnestly and at length that the act is invalid in toto because it is essentially discriminatory and violative of the fundamental principles of equality and uniformity as applicable to taxation. We do not understand it to be the position of plaintiff that any particular classification or exemption contained in the act is discriminatory as to the persons thereby affected because of the existence of particular or specific facts which it might require the introduction of evidence to establish. (Cf. Ohio Oil Co. v. McFarland [D. C., 1928] 28 Fed. [2d] 441, and same case sub nom. Ohio Oil Co. v. Conway [D. C., 1928] 34 Fed. [2d] 47; Id. [1929] 279 U. S. 813, 49 S. Ct. 256, 73 L. Ed. 972; Id. [1930] 281 U. S. 146, 50 S. Ct. 310, 74 L. Ed. 775; Jackson v. St. Bd. Tax Comrs. [D. C., 1930] 38 Fed. [2d] 652; St. Bd. Tax Comrs. v Jacskson [1931] 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464). But plaintiff takes the broad general position that it must be said from the face of the law itself and from matters which the court may judicially notice that the provisions of the act granting certain exemptions and establishing different rates for different groups of taxpayers are so unlawfully discriminatory and so repugnant to the requirements of equality and uniformity as applicable to tax laws as to render the act as a whole an invalid exercise of the taxing power.

██ ██ The exemption provisions of the act will be found for the most part in sections 3 and 4 thereof, which were set out in full at the beginning of this opinion. By subds. (a) to (e) of section 2 (also hereinbefore quoted) the rates imposed upon the occupations taxed are substantially as follows; upon manufacturers, processors, compounders, etc., and upon wholesalers, one-fourth of one per cent; upon producers, feeders, buyers, sellers, etc., of livestock, one-half

of one per cent; upon occupations compensated by wage or salary, one per cent up to two thousand dollars, one and one-half per cent on the excess to five thousand, and two per cent on the excess above five thousand; upon all other businesses, trades, professions, occupations, and callings, one per cent; an extremely low rate is extended, in substance, to the business of money lending by a provision in the section defining gross income to the effect that when obligations representing borrowed money are paid the principal thereof shall not constitute gross receipts.

To determine the validity of these provisions with relation to exemptions and to varying rates of tax we must seek first to form some criteria for judgment. The language of our Constitution having specific reference to ad valorem property taxation or to income tax can have no application to this case, in view of the nature of the present tax as we have determined it, and our entire discussion herein as to power of classification and exemption must be understood as limited to occupational taxes. Constitutional provisions which primarily require consideration are section 17, art. 6, S. Dak. Constitution, providing that "all taxation shall be equal and uniform," and that portion of the Fourteenth Amendment to the Federal Constitution forbidding any state to "deny to any person within its jurisdiction the equal protection of the laws." We are aware that this court stated in so many words in Wheelon v. S. Dak. Land Settlement Bd. (1921) 43 S. D. 551, 181 N. W. 359, 363, 14 A. L. R. 1145, and reiterated in Peterson Oil Co. v. Frary (1923) 46 S. D. 258, 192 N. W. 366, and in Commercial State Bk. v. Wilson (1928) 53 S. D. 82, 220 N. W. 152, that the last clause of section 17, art. 6, had been "obliterated from the Constitution by the adoption of amended article 11, § 2, in November, 1918." That language was used in connection with a property tax subsequently to the 1918 amendment of article 11, § 2, of our Constitution, which amendment affirmatively and for the first time, empowered the legislature to divide all property into classes and to determine what class or classes of property should be subject to taxation and what, if any, should not. The language quoted was used in reply to the argument that even after the 1918 amendment taxation on all property must be equal and uniform, notwithstanding the broad permission of that amendment to classify for tax purposes. A better understanding of the matter may be had by

setting out the entire paragraph wherein the language mentioned was used. It is as follows

"It is insisted that the operation of the act will result in unequal and nonuniform taxation in violation of Const. art. 6 § 17. It is sufficient to state that the last clause of said section, 'and all taxation shall be equal and uniform,' has been obliterated from the Constitution by the adoption of amended article 11, § 2, in November, 1918."

The language must be construed in the light of the occasion of its use. It was spoken with reference to a property tax and amounts merely to a euphemistic and unduly broad manner of stating that since the 1918 amendment of section 2, art. 11, the provisions of section 17, art. 6, could not be availed of to prevent the classification of property for tax purposes or the imposition of different rates on different classes. So limited, it is a true statement, but beyond that point it is not. Of the cases which, without any particular consideration or discussion, repeated this extremely broad language the Commercial Bk. v. Wilson Case was a classified property tax case and, as in the Wheelon Case, section 17 of art. 6 could not prevent the property classification. The Peterson Oil Co. v. Frary Case was not a tax case at all, but involved an exercise of the police power. Section 17 of art. 6 could never conceivably limit the exercise of the police power or be applicable thereto and it was immaterial, for the purposes of that case, whether that fact was pointed out or whether the same result was accomplished by the "short cut" method of reiterating the statement in the Wheelon Case to the effect that section 17, art. 6, no longer existed. We are of the opinion that, so far as concerns taxes other than property taxes, section 17, art. 6, was in no manner affected by the 1918 amendment of section 2, art. 11. It is just as valid and just as much a part of the Constitution as ever it was. For the purposes of this case, however, the existence of section 17, art. 6, will probably have little ,if any, practical effect upon the result arrived at, for it seems universally agreed so far as concerns occupational taxation, that a general constitutional provision requiring equality and uniformity of taxation imposes upon the legislature no limitation or restriction different from or beyond that imposed by the Federal Constitutional requirement of equal protection of the laws, and there is therefore little practical differ-

ence whether our standard of constitutionality be sought in the Fourteenth Amendment or in the language of section 17, art. 6, of our State Constitution.

"However, whether the constitutional prohibition requiring equality and uniformity of taxation applies to ordinary occupation taxes and the like, as distinguished from property taxes, or not, is of little practical importance. If it does not apply, the tax must nevertheless be the same upon all persons in the same class. If it does apply, the legislature may nevertheless classify vocations and impose a tax of a different amount upon the different occupations, providing all persons of the same class are taxed alike." Cooley Taxation, Fourth Edition, § 269, p. 574.

Our own court has previously recognized section 17 of article 6 as imposing, with reference to occupation taxes, substantially the same rule as that universally recognized in the several states, whether present or absent such a constitutional provision. In re Watson (1903) 17 S. D. 486, 97 N. W. 463, 2 Ann. Cas. 321; In re McKennan's Est. (1910) 25 S. D. 369, 126 N. W. 611, 33 L. R. A. (N. S.) 606; Id., on rehearing (1911) 27 S. D. 136, 130 N. W. 33, 33 L.R.A. (N.S.) 620, Ann.Cas. 1913D, 745; State v. Doran (1912) 28 S. D. 486, 134 N. W. 53. These South Dakota cases pretty well state the rule deducible from the decisions with reference to classification for tax purposes so far as concerns occupation taxes. It is well agreed that the legislature may select some occupations for taxation and not others and may classify for the purpose provided that the classification is reasonable and not arbitrary and bears some relation to the subject in hand. The essence of these rules is reiterated again and again in the decisions with some slight modifications of language but none of substance. One of the early statements of the rule in the Federal cases which is very frequently cited is found in Bell's Gap Ry. Co. v. Pa. (1890) 134 U. S. 232, 10 S. Ct. 533, 535, 33 L. Ed. 892, where the court said:

"The provision in the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property from any taxation

at all, such as churches, libraries and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the state legislature, or the people of the State in framing their Constitution. But clear and hostile discriminations against particular persons and classes, especially such as are of an unusual character, unknown to the practice of our governments, might be obnoxious to the constitutional prohibition. It would, however be impracticable and unwise to attempt to lay down any general rule or definition on the subject, that would include all cases. They must be decided as they arise. We think that we are safe in saying, that the Fourteenth Amendment was not intended to compel the States to adopt an iron rule of equal taxation."

A recent and well-considered statement of the rule is found in Commonwealth v. Girard Life Ins. Co. (1932) 305 Pa. 558, 158 Atl. 262, 263, 83 A. L. R. 460, as follows:

"We think it would profit not at all to review all of the many cases determined by us and by the Supreme Court of the United States passing upon tax appeals under the two constitutional provisions. There is a guiding principle which runs through all of them: Is there such a difference between the entity taxed and the one not levied upon, with relation to the act in respect to which the classification is proposed, as justified the Legislature in fixing the classes which it did? If there is, the statutory provision is valid; if not, it is void. As we said in Schoyer v. Comet Oil & Refining Co., 284 Pa. 189, 197, 130 A. 413, 416, summarizing our own cases and those decided by the Supreme Court of the United States: 'The test of classification is whether it produces diversity in results or lack of uniformity in its operation, either on the given subject of tax, or the persons affected as payers. * * * Classification cannot be made arbitrarily. * * * It must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and

can never be made arbitrarily and without any such basis. * * * Nor may any question be raised concerning the right of the commonwealth to classify properties and their owners for the purpose of taxation.' In the leading case, Ayars' Appeal, 122 Pa. 266, 16 A. 356, 2 L. R. A. 577, we laid down the principle governing classification (page 281 of 122 Pa., 16 A. 356, 363): 'Classification * * * is essentially unconstitutional, unless a necessity therefor exists,—a necessity springing from manifest peculiarities, clearly distinguishing those of one class from each of the other classes.' The Supreme Court of the United States, speaking through Mr. Justice Roberts, in the Chain Store Tax Case, State Board of Tax Commissioners of Indiana v. Jackson, 283 U. S. 527, 539, 51 S. Ct. 540, 543, 75 L. Ed. 1248, 73 A. L. R. 1464, thus sums up the constitutional principle: 'The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction. * * * A very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses, or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law. It is not the function of this court * * * to consider the propriety or justness of the tax. * * * Our duty is to sustain the classification adopted by the legislature if there are substantial differences between the occupations seperately classified. Such differences need not be great.' "

The excellence of a discussion of the principles involved, together with a recognition of the difficulty of their application, by Mr. Justice McKenna in Magoun v. Ill. Trust and Savings Bk. (1898) 170 U. S. 283, 18 S. Ct. 594, 598, 42 L. Ed. 1037, well justifies its partial reproduction here:

"The clause of the Fourteenth Amendment especially invoked is that which prohibits a State denying to any citizen the equal protection of the laws. What satisfies this equality has not been and probably never can be precisely defined. Generally it has been said that it 'only requires the same means and methods to be applied impartially to all the constituents of a class so that the law shall operate equally and uniformly upon all persons in similar

circumstances.' Kentucky Railroad Tax cases, 115 U. S. 321, 337, 6 S. Ct. 57 [29 L. Ed. 414]. It does not prohibit legislation which is limited, either in the objects to which it is directed or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated alike under like circumstances and conditions both in the privilege conferred and the liabilities imposed. Hayes v. Missouri, 120 U. S. 68, 7 S. Ct. 350 [30 L. Ed. 578]. Similar citations could be multiplied. But what is the test of likeness and unlikeness of circumstances and conditions? These expressions have almost the generality of the principle they are used to expound, and yet they are definite steps to precision and usefulness of definition, when connected with the facts of the cases in which they are employed. With these for illustration it may be safely said that the rule prescribes no rigid equality and permits to the discretion and wisdom of the State a wide latitude as far as interference by this court is concerned. Nor with the inpolicy of a law has it concern. Mr. Justice Field said in Mobile County v. Kimball, 102 U.S. 691, 704 [26 L.Ed. 238], that this court is not a harbor in which can be found a refuge from ill-advised, unequal and oppressive state legislation. And he observed in another case: 'It is hardly necessary to say that hardship, impolicy or injustice of state laws is not necessarily an objection to their constitutional validity.' The rule, therefore, is not a substitute for municipal law; it only prescribes that that law have the attribute of equality of operation, and equality of operation does not mean indiscriminate operation on persons merely as such, but on persons according to their relations. In some circumstances it may not tax A more than B, but if A be of a different trade or profession than B, it may. * * *' And Mr. Justice Brewer, in Gulf, Colorado & Santa Fe Railway v. Ellis, 165 U. S. 150, 165, 17 S. Ct. 255 [41 L. Ed. 666], after a careful consideration of many cases, said: 'It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the Fourteenth Amendment, and that in all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification—and is not a mere arbitrary selection.'

"Two principles, therefore, must be reconciled in the Illinois inheritance law if it is to be sustained, the equality of protection of the laws guaranteed by the Fourteenth Amendment, and the power of the State to classify persons and property. The latter principle needs further consideration. What test is there of the reasonableness of a classification—of one based upon 'some difference which bears a just and proper relation to the attempted classification—and is not a mere arbitrary selection?' Legislation special in character is not forbidden by it, as we have seen. Treating mechanics as a class, and giving them a lien for the amount of their work, has been held reasonable. Charging a railroad corporation and not other corporations or persons with an attorney's fee has been held unreasonable, yet the former would seem to be as much an exclusive favor as the latter an exclusive burden. * * *

"And so Mr. Justice Miller, speaking for the court in Davidson v. New Orleans, 96 U. S. 97, 105 [24 L. Ed. 616], said: 'The Federal Constitution imposes no restraints on the State in regard to unequal taxation.'

"The court, through Mr. Justice Lamar, in Pacific Express Co. v. Seibert, 142 U. S. 339, 12 S. Ct. 250 [35 L. Ed. 1035], was equally emphatic. He said on page 351 of 142 U.S. and on page 253 of 12 S. Ct.: 'This court has repeatedly laid down the doctrine that diversity of taxation, both with respect to the amount imposed and the various species of property selected either for bearing its burdens or from being exempt from them, is not inconsistent with a perfect uniformity and equality of taxation in the proper sense of those terms; and that a system which imposes the same tax upon every species of property, irrespective of its nature or condition or class, will be destructive of the principles of uniformity and equality in taxation and of a just adaptation of property to its burdens.' And it was said in Merchants' Bank v. Pennsylvania, 167 U. S. 461, 17 S. Ct. 829 [42 L. Ed. 236] : 'Indeed, this whole argument of a right under the Federal Constitution to challenge the tax law on the ground of inequality in the burdens resulting from the operation of the law is put at rest by the decision in Bell's Gap Railroad v. Pennsylvania.'

"There is therefore no precise application of the rule of reasonableness of classification, and the rule of equality permits many practical inequalities. And necessarily so. In a classification for

governmental purposes there cannot be an exact exclusion or inclusion of persons and things. Bearing these considerations in mind we can solve the questions in controversy."

These broad principles have been enunciated and elaborated and the application thereof undertaken in literally a host of cases. Inter alia, we may cite: Republic Iron and Steel Co. v. State (1920) 204 Ala. 469, 86 So. 65; Davies v. City of Hot Springs (1920) 141 Ark. 521, 217 S. W. 769; Heriot v. City of Pensacola (1933, Fla.) 146 So. 654; Wright v. Hirsch (1923) 155 Ga. 229, 116 S. E. 795; Southern Transfer Co. v. Harrison (1930) 171 Ga. 358, 155 S. E. 338; Fulton Bro. Elec. Co. v. Harrison (1930) 171 Ga. 571, 156 S. E. 255; Milliron v. Harrison (1932) 175 Ga. 764, 166 S.E. 231, 84 A.L.R. 1142; Link v. Commonwealth (1924) 205 Ky. 243, 265 S. W. 804; Gulf Ref. Co. v. McFarland (1923) 154 La. 251, 97 So. 433 (affirmed, Id., 264 U.S. 573, 44 S.Ct. 402, 68 L.Ed. 856); Stewart v. Potts (1874) 49 Miss. 749; Holberg v. Town of Macon (1877) 55 Miss. 112; Coca-cola Co. v. Skillman (1907) 91 Miss. 677, 44 So. 985; Adams v. Standard Oil Co. (1910) 97 Miss. 879, 53 So. 692; Mathison v. Brister (1933, Miss.) 145 So. 358; Ex parte Asotsky (1928) 319 Mo. 810, 5 S. W. (2d) 22, 62 A. L. R. 95; State v. Elkins (1924) 187 N. C. 533, 122 S. E. 289; Caldwell v. State (1926) 115 Ohio St. 458, 154 N. E. 792; Portland Van and Storage Co. v. Hoss (1932) 139 Ore. 434, 9 Pac. (2d) 122, 81 A.L.R. 1136; Thompson v. Indiana County (1924) 83 Pa.Sup.Ct. 248; Hill Co. v. Whitice (1924) 149 Tenn. 168, 258 S. W. 407; McKenney v. City Council (1927) 147 Va. 157, 136 S. E. 588; Commonwealth v. Bibee Grocery Co. (1930) 153 Va. 935, 151 S. E. 293; State ex rel Hickey v. Levitan (1926) 190 Wis. 646, 210 N. W. 111, 48 A. L. R. 434; Great Atl. & Pac. Tea Co. v. Morrissett (D. C. 1931) 58 Fed. (2d) 991, (affirmed 284 U. S. 584, 52 S. Ct. 127, 76 L. Ed. 506); Penny Stores, Inc., v. Mitchell (D. C., 1932) 59 Fed (2d) 789; American Sugar Refining Co. v. Louisiana (1900) 179 U. S. 89, 21 S. Ct. 43, 45 L. Ed. 102; Connolly v. Union Sewer Pipe Co. (1902) 184 U. S. 540, 22 S. Ct. 431, 46 L. Ed. 679; Cook v. Marshall County (1905) 196 U. S. 261, 25 S. Ct. 233, 49 L. Ed. 471; Kehrer v. Stewart (1905) 197 U. S. 60, 25 S. Ct. 403, 49 L. Ed. 663; Armour Packing Co. v. Lacy (1906) 200 U. S. 226, 26 S. Ct. 232, 50 L.Ed. 451; Mich. Cent. Ry. Co. v. Powers (1906) 201 U.S. 245,

26 S. Ct. 459, 50 L. Ed. 744; S. W. Oil Co v. Texas (1910) 217 U. S. 114, 30 S. Ct. 496, 54 L. Ed. 688; Quong Wing v. Kirkendall (1912) 223 U. S. 59, 32 S. Ct. 192, 56 L. Ed. 350; Royster Guano Co. v. Com. Virginia (1920) 253 U. S. 412, 40 S. Ct. 560, 64 L.Ed. 989; Alaska Fish Salting & By-P. Co. v. Smith (1921) 255 U.S. 44, 41 S.Ct. 219, 65 L.Ed. 489, (affirming, Id., 6 Alaska 173); Heisler v. Thomas Colliery Co. (1922) 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; Ohio Oil Co. v. Conway (1930) 281 U. S. 146, 50 S. Ct. 310, 74 L. Ed. 775; St. Bd. Tax Comrs. v. Jackson (1931) 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464, (reversing, Id., 38 Fed. (2d) 652; petition for rehearing denied, see 75 A. L. R. 1536); Lawrence v. State Tax Commission (1932) 286 U. S. 276, 52 S. Ct. 556, 76 L. Ed. 1102; Liggett Co. v. Lee (1933) 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699. The results arrived at have been as various as the problems presented. So long as all in the established class receive uniform treatment the class may be extremely restricted and apparently may rest upon very narrow distinctions. The legislature may distinguish for tax purposes between chain store merchandising and the individually operated small store or department store. They may also make the difference between the integrated chain and the voluntary chain a basis for classification for tax purposes. Liggett v. Lee, supra. Dealers in cigarettes may be placed in a class by themselves for tax purposes even though dealers in other types or form of tobacco are not taxed. Ex parte Asotsky, supra. The occupation of selling sigarettes at retail may be taxed without taxing the occupation of selling cigarettes at wholesale. Cook v. Marshall County, supra. The occupation of meat packing may be taxed without taxing the sales of meat products and without taxing the packing or canning of other food commodities. Armour Packing Co. v. Lacy, supra. Wholesale dealers in mineral oil and petroleum products may be taxed without taxing wholesalers of other articles. S. W. Oil Co. v. Texas, supra. The occupation of producing anthracite coal may be taxed without taxing the occupation of producing bituminous coal though both are produced in substantial quantities within the state and are marketed to a very considerable extent in competition one with another. Heisler v. Thomas Colliery Co., supra. The occupation of manufacturing fish oil and fertilizer from herring may be taxed

at a higher rate than the occupation of manufacturing the same product from salmon refuse or other material. Alaska Fish Salting, etc., Co. v. Smith, supra. A license tax may be imposed on persons engaged in the laundry business without taxing steam laundries and without application to women so engaged where not more than two women are employed. Quong Wing v. Kirkendall, supra. A tax may be imposed on the privilege of "doing business as a loan company" without taxing banks, trust companies, and building and loan associations which also loan money. Link v. Commonwealth, supra. And so we might go on almost indefinitely.

The reader of any considerable number of these cases cannot but be impressed with the fact that the courts invariably, if they sense any possibility of so doing, sustain the legislative action in regard to classification. They recognize that taxation presents a practical problem; that exact equality is utterly impossible, and that the legislative discretion should be sustained if it can be.

"Taxation is a very practical problem. It deals with needs and subjects of taxation of a practical nature. Complete equality and uniformity in the imposition of the tax burden must remain an ideal until human ingenuity can perfectly appraise the myriad differences—some readily discernible, others obscure, but none the less real—between the vast variety of subjects of taxation. Since the review of legislative wisdom is a matter for executive veto, but not for judicial action, the courts are bound to assume that the Legislature has paid due heed to all economic considerations affecting classifications and yield full effect to the tax-imposing statute, unless it is impossible to discern any substantial differences between the occupations separately classified. Differences need not be great unless a purpose is revealed to destroy one class or unreasonably hamper it for the benefit of another group circumstanced substantially similar to the unfavored group." Portland Van & Storage Co. v. Hoss (1932) 139 Ore. 434, 9 P. (2d) 122, 127, 81 A. L. R. 1136.

An examination of the decisions we have cited above will reveal that in most of them the classification problem was presented to the court from the viewpoint of the specific and particular. The question generally was whether a certain group could be taxed in a certain fashion without likewise taxing closely allied groups of fairly comparable interests. In this case the problem is pre-

sented to us from precisely the opposite angle. There being indicated by the legislature a general intention of comprehensive occupational taxation (in our case substantially universal occupational taxation), what can the legislature properly do by way of classification and exemption? Comprehensive occupational taxation being comparatively a recent development from the specific and particular, we have not discovered a great many cases dealing with the problem from this point of view. Under the Illinois statute previously mentioned, purporting to tax the business of selling tangible personal property at retail, the Supreme Court of that state held (Winter v. Barrett [1933] cited supra, 352 Ill. 441, 186 N. E. 113) that the taxed classes established by the act embraced all persons engaged in the business of selling tangible property at retail, and the court applied to that broad classification the general rules hereinbefore discussed and held that vendors of motor fuel could not be exempted, nor could farmers vending their own produce at retail. It seems fair to assume that by a parity of reasoning the Illinois court would have held that all vendors of tangibles at retail must be taxed at the same rate. The Supreme Court of Kentucky, on the other hand, in a case hereinbefore cited (Moore v. St. Bd. Charities [1931] 239 Ky. 729, 40 S. W. [2d] 349) found no difficulty in approving with very little discussion the exemption of farmers and gardeners selling their own produce from the provisions of a statute imposing a graduated tax measured by gross receipts on retail merchants, and the Supreme Court of Washington in the hereinbefore cited case of State ex rel Stiner v. Yelle (1933) 25 Pac. (2d) 91, 92, approved the exclusion of those engaged in agricultural pursuits from the provisions of a statute imposing a tax quite universal in application on the "privilege of engaging in business activities."

It seems to us that the logic of the situation should be the same regardless of the angle of approach. One thing that has undoubtedly caused some confusion in the cases is the fact that though there is much talk in the tax decisions of "classification for taxing purposes" and "the class taxed," and much similar language of classification, nevertheless there is, in fact, in the field of taxation neither a structure nor method of classification nor any applicable terminology. The essence of any scheme of orderly classification is categorical division and subdivision from the in-

clusive down to the smallest unit and some agreed name for each category, as, for example, the natural history classification where the most comprehensive category is called the sub-kingdom, and the sub-kingdoms are divided into classes, the classes into orders, the orders into families, the families into genera, and the genera into species. If we had, in fact, any technique or method of classification for occupational tax purposes we would have to have at the top a comprehensive category embracing all taxable occupations with some kind of a term or name for it and then proceed downward by subdivision until the lowest term of the classification was the smallest unit or group which could be conceived of as susceptible to separate treatment for tax purposes with some sort of a generic name for each category down through the scale. Of course, we have no such classification and undoubtedly the subject is not adapted to that sort of treatment. Nevertheless in our cases we have talked as though we did have a classification, but we have indulged the error of using the nameword "class" indifferently from time to time to mean every conceivable category of our imagined classification from the lowest to the highest. It seems hardly accurate or logical to say that every member of the taxed class must be treated uniformly unless we confine the meaning of the word "class" to the smallest group susceptible of distinct tax treatment. If the legislature has power to treat certain classes separately for tax purposes it would seem to follow that the legislature, if it desires to do so, may treat them in the same manner. Suppose that the retailers in a state consist of twenty separable and distinct classes or groups and concede that each group is susceptible of distinct and separate tax treatment; then there is no logical reason why the legislature need deal with these twenty classes by twenty separate laws and if the legislature sees fit to deal with them in one comprehensive law under the broader term "retailers" this does not necessarily mean that the twenty included classes susceptible of separate treatment have lost their nature in that respect or that all retailers have now become a class throughout which uniformity must prevail. It merely means that the legislature, authorized to treat the twenty classes separately, has elected to treat them alike to the extent that the act so provides, but no farther, and there seems no logical reason why the legislature, under those circumstances, could not provide in such an act for a

tax of two per cent on all retailers with the exception that class five should be entirely exempted, class seven should pay only one per cent, and class nine should pay five per cent. We do not mean to say that this result would necessarily follow, but there is no logical reason why it should not. Certainly what the legislature could do by twenty separate and distinct laws, one dealing with each class, it can equally well accomplish by one law as we have supposed. The mere fact that the legislature attacks the matter nominally by proceeding to deal with a broad and comprehensive intermediate category of the assumed tax classification structure does not mean that all subdivisions included in that category are, by that mere fact, entitled to uniformity of treatment if they were previously and otherwise susceptible of separate and distinct treatment. Of course, the test in the last analysis being whether the discriminations made by the legislature are reasonable or arbitrary, no hard and fast rule can be established. The question cannot be determined (to borrow a phrase from Prof. Thurman Arnold) "according to the inexorable dictates of impersonal logical science." We can fashion no automatic device for determining our judicial judgment which we can apply to every case and read off the result as from a slide rule, nor can we prescribe any precise formulae for legislative guidance whereby a legislature may know that its tax law result will be good or bad according to whether or not the farmulae are accurately followed. Into the question of reasonableness a vast number of factors must necessarily enter. Reasonableness is dependent upon the facts and circumstances and in determining it the taxing scheme as a whole cannot be neglected. A classification reasonable with reference to one taxing scheme would not necessarily be reasonable with reference to another. It might, for example, be reasonable to tax the privilege of selling cigarettes without imposing a tax upon any other retail vendors. On the other hand, it might or might not be reasonable when taxing all retail vendors to impose a different rate on retailers of cigarettes or to exempt them entirely. It might be reasonable to impose a different amount of tax upon different classes although it would be unreasonable entirely to exempt any of them. As pointed out by Judge Cardozo in his dissenting opinion in Liggett v. Lee, supra (1933), 288 U.S. 517, 53 S.Ct. 481-503, 77 L.Ed. 929, 85 A. L. R. 699, there may very well be "a distinction not to be

ignored between the facts that determine subjection to a tax and those that measure its amount." Or. as stated in Louisville Gas and Electric Co. v. Coleman (1928) 277 U.S. 32, 48 S.Ct. 423, 425, 72 L. Ed. 770, "But classification good for one purpose may be bad for another; and it does not follow that because the state may classify for the purpose of proportioning the tax, it may adopt the same classification to the end that some shall bear a burden of taxation from which others under circumstances identical in all respects save in respect of the matter of value, are entirely exempt." In the last analysis, it can only be said that the matter is not susceptible of mathematical computation or scientific determination, but the question must be in every individual case as it is presented whether, in the light of the general principles announced by the decisions, the action of the legislature, under all the circumstances, bearing in mind, among other entering factors, the taxing scheme evidenced by the act and existent in the jurisdiction, has discriminated unreasonably or arbitrarily.

To take up each item of classification and exemption in the statute before us and discuss it in detail would be an interminable task. Plantiff contends that it was unnecessary for the legislature to make some of the exemptions embraced in the act, or, as plaintiff phrases it, that certain of the classes "were not entitled to exemption." To that extent we agree with plaintiff. We think some of the exempted classes would have had no legitimate ground for complaint had they been included under the operation of the law. That is not to say, however, that it was necessarily or per se unreasonable for the legislature in its discretion to exempt them if it saw fit to do so. Plaintiff particularly complains of the provision taxing production and dealing in livestock at the rate of one-half of one per cent only, while the agricultural producer dealing in grain would probably be required to pay one per cent under section 2 (e). Plaintiff argues that this is primarily an agricultural state, the products of agriculture being grain and livestock, and that it is unconstitutionally discriminatory in a taxing law to treat the livestock producer more favorably than the grain producer. With the wisdom or social justice of such treatment we cannot concern ourselves. Some grounds for distinction of greater or lesser arguable validity quite readily present themselves to the mind. Of this particular classification we can only say, as

we say of the other classifications and exemptions in the act (and we have endeavored to consider them all with care), that we are not willing to hold from the face of the law and from facts of which we may take judicial notice that the legislature acted unreasonably or arbitrarily. It follows therefore that the classifications and exemptions must be deemed valid upon the record before us.

We have endeavored to devote to this case the care and consideration (so far as time and the necessity for disposition without undue delay, permitted) which its importance deserved. We may summarize our conclusions as follows: To the extent that it purports to tax the privilege of engaging in businesses, professions, occupations, pursuits, etc., in this state (but not further) the law may be sustained as a valid exercise of legislative power. So much of the law as attempts to reach the gross receipts of the taxpayer other than receipts arising out of or necessarily incident to his exercise of the privilege of being engaged in an occupation, business, pursuit, profession, etc., is invalid. So much of the act as attempts to reach the gross receipts of transactions in interstate commerce (whether the origin of such interstate transactions be in South Dakota or outside South Dakota) is invalid. The classifications and exemptions made in the act (and effective to the extent of the validity of the act as above mentioned) are not prima facie unreasonable or arbitrary.

There remains for final disposition the question as to whether or not the remainder of the act can stand in spite of the invalidity of certain portions as hereinbefore declared. The usual rule was repeated by this court in State v. Portwood (1931) 59 S. D. 179, 238 N. W. 879, as follows:

"The general rule has recently been announced by this court in the case of Haines v. Rapid City et al, 59 S. D. 58, 238 N. W. 145, to the effect that, before a law will be held unconstitutional in part and valid in part, the portion which remains must not only be complete in itself, but the court must be able to say the Legislature would have passed the remaining and valid portions of the law independent of the provisions of the unconstitutional or invalid portions."

This statute, however, contains the popular legislative device known as a "saving clause," section 19 of the Act reading as follows:

"If any clause, sentence, paragraph, or part of this Act shall for any reason be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder of this Act, but shall be confined in its operation to the clause, sentence, paragraph, or part thereof directly involved in the controversy in which such judgment shall have been rendered."

For a discussion of the effect of such a clause where partial invalidity is determined, see Notes 25 Mich. Law Rev. 523; 40 Harv. Law Rev. 626. Of course, the legislature cannot be permitted by the employment of that clause to usurp the judicial function. Nevertheless we think the clause is not to be disregarded in the matter of determination of probable legislative intent. The situation seems adequately treated by Mr. Justice Sutherland in Williams v. Standard Oil Co. (1929) 278 U. S. 235, 49 S. Ct. 115, 117, 73 L. Ed. 287, 68 A. L. R. 596, wherein he said:

"In Hill v. Wallace, 259 U. S. 44, 71, 42 S. Ct. 453, 459, 66 L. Ed. 822, it is said that such a legislative declaration serves to assure the courts that separate sections or provisions of a partly invalid act may be properly sustained 'without hesitation or doubt as to whether they would have been adopted, even if the legislature had been advised of the invalidity of part.' But the general rule is that the unobjectionable part of a statute cannot be held separable unless it appears that, 'standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.' The question is one of interpretation and of legislative intent, and the legislative declaration 'provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command.' Dorchy v. Kansas, 264 U. S. 286, 290, 44 S. Ct. 323, 325, 68 L. Ed. 686.

"In the absence of such a legislative declaration, the presumption is that the legislature intends an act to be effective as an entirety. This is well stated in Riccio v. Hoboken, 69 N. J. L. 649, 662, 55 A, 1109, 1113, 63 L. R. A. 485, where the New Jersey Court of Errors and Appeals, in an opinion delivered by Judge Pitney (afterward a Justice of this Court), after setting forth the rule as above, said:

" 'In seeking the legislative intent, the presumption is against any mutilation of a statute, and the courts will resort to elimination only where an unconstitutional provision is interjected into a statute otherwise valid, and is so independent and separable that its removal will leave the constitutional features and purposes of the act substantially unaffected by the process.'

"Compare Illinois Central Railroad v. McKendree, 203 U. S. 514, 528-530, 27 S. Ct. 153, 51 L. Ed. 298; Employers' Liability Cases, 207 U. S. 463, 501, 28 S. Ct. 141, 52 L. Ed. 297; Butts v. Merchants' Transportation Co., 230 U. S. 126, 132, et seq., 33 S. Ct. 964, 57 L. Ed. 1422; and see 1 Cooley's Constitutional Limitations (8th Ed.) 362, 363, and note.

"The effect of the statutory declaration is to create in the place of the presumption just stated the opposite one of separability. That is to say, we begin, in the light of the declaration, with the presumption that the legislature intended the act to be divisible; and this presumption must be overcome by considerations which make evident the inseparability of its provisions or the clear probability that the invalid part being eliminated the legislature would not have been satisfied with what remains."

In the light of the principles there enunciated we find nothing in this case from which we can believe that it is clearly evident that the legislature would not have been satisfied (no more being obtainable) with the valid portions of the act. We realize that the act, limited to the portions thereof which we have said are valid, will function somewhat differently than it would if it could be sustained in toto as the legislature enacted it. Nevertheless, we do not think that the probable difference in functioning is so great or substantial as to overcome the presumption arising from the legislative declaration embraced in section 19 of the act. We are therefore of the opinion that we should not declare the entire statute invalid. There is a workable entity left and we think it should be permitted to operate to the extent and within the limitations hereinbefore set forth. Cf. Prouty v. Coyne (D. C., 1932) 55 Fed. (2d) 289. We believe, indeed, that we should reach this same result with reference to this particular statute even were the "saving clause" entirely absent therefrom. The legislature, as specifically set forth in the act, was passing an emergency revenue measure. It is common knowledge that our ad valorem property

tax system is being strained almost to the breaking point and that there is most urgent need for some means or device for the raising of public revenues. We are quite well satisfied that the legislature would have preferred to enact the half loaf rather than have no bread.

Being of the opinion therefore that the statute is a valid exercise of legislative power to the extent and within the limitations we have hereinbefore pointed out and being further of the opinion that upon the record before us and from the face of the law and matters subject to judicial notice, we cannot say that the act contains any classifications or exemptions so unreasonable or so arbitrary as to impair its validity as a whole, the order of this court will be that this proceeding be dismissed.

All the Judges concur excepting WARREN, J., who concurs in the result.

No costs will be taxed.